```
            IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
                       EASTERN DIVISION
```

United States of America,        )
State of Illinois, State of      )
North Carolina                   )
                                 )
    Ex rel. Raymond Dolan,       )
                                 )
             Plaintiffs,         )
    v.                           )   No. 10 C 368
                                 )
Long Grove Manor, Inc. d/b/a     )
Arlington Rehabilitation &       )
Living Center, et al.            )
                                 )
             Defendants.         )

<u>MEMORANDUM OPINION AND ORDER</u>

In this *qui tam* action, relator Raymond Dolan alleges that various skilled nursing facilities ("SNFs") and certain physicians and service providers with whom they contracted violated the False Claims Act, 31 U.S.C. § 3729(a)(1); the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b); the Stark Law, 42 U.S.C. § 1395nn; the Illinois Whistleblower Reward and Protection Act ("IWRPA"), 740 ILCS § 175/1, *et seq.*; and the North Carolina False Claims Act, N.C.G.S.A. § 1-605, *et seq.* through a fraudulent scheme that included unlawful self-referrals and bonus payments, the provision of inappropriate or unlicensed treatments and services, the miscoding of procedures, and the submission of false claims, cost reports, and certifications to Medicare and Medicaid.  Relator

also alleges that defendants retaliated against him in violation of the anti-retaliation provisions of the False Claims Act and the IWRPA.

Before me are five motions to dismiss: one by each of the three physician defendants, Drs. Stanford Tack, Kalpesh Patel, and Yakov Ryabov; one by the service provider Fox Valley Wound Care Associates; and one by the SNFs, collectively. For the reasons that follow, the motions are granted.

I.

In the opening paragraph of his First Amended Complaint ("FAC"), relator asserts that he was a Corporate Nurse employed by defendant Arlington from April of 2003 to July 30, 2007, and that in that capacity, he "was privy to intimate details of Defendant businesses and management behaviors." FAC at ¶ 1. What he discovered, as he describes in the ensuing 151 paragraphs, was a multifaceted and far-reaching fraudulent scheme carried out by three individuals and thirteen entities[1] providing healthcare services in Illinois, North Carolina, Utah, and Colorado. In the "Factual Allegations" portion of the FAC, relator delineates eight categories of fraudulent activity. The following is a summary of the allegations in each category.

---

[1] All but one of the entities—Fox Valley—are alleged to share corporate ownership and management. The First Amended Complaint actually names fourteen entities in all, but one of them—Omnicare—was dismissed voluntarily on June 9, 2014.

2

The FAC captions the first type of wrongful conduct "Self-Referral/Bonuses for Increased Medicare & Medicaid Income." In this section, relator alleges that the physician defendants "were given remuneration for patient referrals because as medical directors they were each paid a flat monthly fee to be medical directors on the contingent basis that they continued to refer patients to their facility in violation of STARK." *Id*. at ¶ 38. As to Dr. Tack specifically, this relationship allegedly resulted in "double-billing to the United States." *Id*. at ¶ 39. Relator also alleges that "Defendants paid bonuses to its (sic) Directors of Business Development" that were keyed to increases in the SNFs' Medicare patient population.[2] *Id*. at ¶ 41.

Relator captions the second category "False Claims for Medicare Payments for Skilled Nursing Care." The factual allegations in this portion of the FAC assert that SNF Business Director Whitney Arado "worked with Dr. Ryabov to admit patients to acute care facilities and then have them re-admitted to the Defendant SNFs…with manipulated clinical records solely for the purpose of satisfying the payment criteria set forth by Medicare and Medicaid." *Id*. at ¶ 43. To accomplish this scheme, "Arado would either falsify medical information about the patient…or Dr.

---

[2] Despite its reference to Business "Directors", the FAC identifies only one individual with this title, Whitney Arado, who is alleged to have an "ownership interest in more than one of the Defendant facilities," and "was compensated by every facility." FAC at ¶ 41.

3

Ryabov would, sometimes without even examining the patient, order a battery of diagnostic tests to be done, and order that the patient stay in the hospital" for the period required to satisfy Medicare criteria for payment. *Id*. at ¶ 46. In addition, Dr. Ryabov would "fabricate the need for physical or occupational therapy services," which allegedly "resulted in Medicare's payment of higher daily reimbursement rates to the SNF." *Id*. at ¶ 47.

The third and fourth categories of wrongdoing, respectively captioned, "Additional Method of Submitting False Claims for Medicare Payments for Skilled Nursing Care," and "Medically Unnecessary Procedures/Upcoding," assert various ways in which defendants allegedly provided improper patient care, and improperly accounted for the care they provided. Relator states that defendant Simply Rehab "colluded with the SNFs" to provide medically unnecessary services; to provide services by unlicensed staff; to backdate physician signatures certifying services; and to "fabricate" patient records in an effort to justify the care provided and to meet Medicare and/or Medicaid payment criteria. *Id.* at ¶¶ 48-54. Relator also asserts that defendants "upcoded" their services, i.e., billed for more costly services than were actually provided. *Id*. at ¶¶ 58-59. The foregoing allegations are illustrated by examples of the cases of four specific patients, identified as Patients W, X, Y, and Z.

Relator's next section, "Submission of False Claims, Cost Reports, and Other Information to Medicare and Medicaid," alleges that defendants were required by law to maintain Cost Reports including a Certificate of Compliance, which had to be signed by an administrator of defendants. These Certificate of Compliance state that the signatory is "familiar with the laws and regulations regarding the provisions of health care services and that the services identified in the Cost Report were provided in compliance with such laws and regulations." *Id*. at ¶ 85. Relator asserts that each of the Cost Reports and Certificates of Compliance that defendants signed from 2000 "until the present" was a false record because defendants "knew that they had violated various laws and regulation[s], including those pertaining to kickbacks, providing medically [un]necessary services, and the waiver of co-payments and deductibles; and (sic)." *Id*. at ¶ 86. Relator also alleges that each Cost Report and Certificate of Compliance was material to the government's decision to pay the claims submitted during those years. FAC at ¶¶ 87.

Relator's sixth category of alleged wrongdoing, "Wound Care: Out of Scope Practice," focuses on defendant Fox Valley Wound Care Associates. The thrust of the allegations in this section is that two, non-party podiatrists associated with Fox Valley, Drs. Lamiot and Tsang, provided medical services on patients at defendant Aurora's facility that exceeded the lawful scope of their

5

licensure. That is, although podiatrists are limited to provide medical services only "on the ankle and below," pursuant to the Podiatric Medical Practice Act of 1987, 225 ILCS 100), Fox Valley's podiatrists performed, and defendants billed Medicare and Medicaid for, wound care treatment above the ankle. In addition, Dr. Lamiot and Dr. Tsang allegedly billed their services for unnecessary medical procedures, and billed their services under another physician's name, which relator asserts, on information and belief, is Dr. Sayeed. *Id*. at ¶¶ 95-100. One patient—patient "V"—is identified as an example of the "out of scope" practice conducted by Fox Valley's podiatrists.

Relator's penultimate section of factual allegations is captioned "Pharmaceutical Contract." The allegations in this portion describe negotiations and agreements between former defendant Omnicare (which relator dismissed voluntarily on June 9, 2014) and defendants Aurora and Arlington. Relator alleges that Omnicare offered "deep discounts" for medications for the SNF's "Medicare A" patients in exchange for the SNFs' agreement to give all of their "Medicare D prescription business" to Omnicare, in violation of the Anti-Kickback Statute. Further, relator claims that Omnicare "is also overbilling Medicare for the prescriptions it provides to the SNFs' Medicare Part D patients by not giving Medicare the same percentage discount that it is giving the facilities." FAC at ¶¶ 103-113.

In a final section captioned "Dual Medicare/Medicaid Eligibility," relator asserts that defendants Willow Ridge and Simply Rehab entered into an agreement under which Simply Rehab provided unnecessary and unlicensed services to patients at Willow Ridge, targeting patients who were eligible for both Medicare and Medicaid, then submitted false claims to both Medicare and Medicaid for the purpose of unlawfully enriching themselves.

II.

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) challenges the sufficiency of a complaint, not its merits. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). To survive a Rule 12(b)(6) motion, the claim must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In addition, the factual material in the complaint must plausibly suggest a right to relief that rises, assuming the truth of the allegations, "above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Because the False Claims Act ("FCA") is an anti-fraud statute, complaints alleging its violation are subject to the heightened pleading requirements of Rule 9(b). *U.S. ex rel. Gross v. AIDS Research Alliance-Chicago*, 415 F.3d 601, 604 (7th Cir. 2005); *United States ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 376 (7th Cir. 2003). This means the complaint must set

forth "the who, what, when, where, and how" of the alleged fraud. *U.S. ex rel Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009); *see also United States ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374 (7th Cir. 2003).

To establish liability under § 3729(a)(1) of the False Claims Act, a relator must prove that the defendant: 1) made a statement in order to receive money from the government; 2) that the statement was false; and 3) that the defendant knew the statement was false. *United States ex rel. Fowler v. Caremark R.X. L.L.C.*, 496 F.3d 730, 740-41 (7th Cir. 2007), *overruled on other grounds by Glaser v. Wound Care Consultants, Inc.,* 570 F.3d 907 (7th Cir. 2009). While the relator is not required to "list every single patient, claim, or document involved," he must offer "at least some representative examples." *Peterson v. Community General Hospital*, 2003 WL 262515, *2 (N.D. Ill. 2003, Feb. 7, 2003). These examples must be pled with the requisite level of specificity "*at an individualized transaction level.*" *Fowler*, 496 F.3d at 742 (original emphasis). Indeed, because the FCA "does not create liability merely for a health care provider's disregard of Government regulations or improper internal practices unless, as a result of such acts, the provider knowingly asks the Government to pay amounts it does not owe," *U.S. ex rel. Clausen v. Laboratory Corp. of America, Inc.*, 290 F.3d 1301, 1311 (11th Cir. 2002), the "*sine qua non* of a False Claims Act violation is

the submission of a fraudulent claim. *Mason v. Medline Industries, Inc.*, No. 07 C 5615, 2009 WL 1438096, *7 (N.D. Ill. May 22, 2009) (Conlon, J.). Accordingly, the relator cannot merely "describe a private scheme in detail but then…allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government." *Clausen*, 290 F.3d at 1311. Rather, he must link specific allegations of deceit to specific claims for payment. *Garst*, 328 F.3d at 378. This standard applies equally to *qui tam* actions under the IWRPA. *Mason*, 2009 WL 1438096 at *2 (*citing Ackerman v. Northwestern Mut. Life Ins. Co.*, 172 F.3d 467, 470 (7th Cir. 1999)).

The Anti-Kickback Statute criminalizes the knowing and willful solicitation, receipt, offer, or payment of any remuneration for referring patients for care or services that the government may pay for, in whole or in part, through a federal health care program. *See* 42 U.S.C. § 1320a-7b. The Stark Law similarly "forbids federal reimbursement for services that stem from compensated referrals." U.S. v. *Rogan*, 517 F.3d 449, 453 (7th Cir. 2008). Neither statute provides a right of private enforcement, but falsely certifying compliance with either is actionable under the FCA. *U.S. v. Rogan*, 459 F. Supp. 2d 692, 717 (N.D. Ill. 2006), *aff'd*, 517 F.3d 449 (7th Cir. 2008). Where an

9

FCA claim is premised on the violation of these laws, the underlying violation must also be pled in compliance with Rule 9(b). *Medline,* 2009 WL 1438096 at *7 (citing *Gross,* 415 F.3d at 605); *United States ex rel. Obert-Hong v. Advocate Health Sys.*, 211 F. Supp. 2d 1045, 1048 (N.D. Ill. 2002).

At the time relevant to relator's allegations, the anti-retaliation provisions of the FCA stated[3]:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

31 U.S.C.A. § 3730(h). The IWRPA contains a parallel retaliatory discharge provision. 740 ILCS 175/4(g). To prevail on a claim pursuant to these provisions, a plaintiff must show that 1) his actions were taken "in furtherance of" an FCA enforcement action and thus protected by the statute; 2) the employer had knowledge that he was engaged in this protected conduct; and 3) that some adverse employment action was taken that was motivated, at least in part, by the protected conduct. *Brandon v. Anesthesia & Pain Management Associates*, Ltd., 277 F.3d 936, 944 (7th Cir. 2002).

---

[3] This section was amended in 2009 by Pub.L. 111-21, § 4(d), but relator relies on the pre-amendment version. The IWRPA contains a parallel retaliatory discharge provision.

10

Internal complaints about an employer's unlawful conduct does not qualify as protected conduct. Rather, the employee's conduct must lead the employer to believe that "a *qui tam* action is a 'distinct possibility,' or 'litigation could be filed legitimately." *Id*. That is, it generally must put an employer "on notice of potential FCA litigation." *Id*. (citations omitted). *See also McDonough v. City of Chicago*, 743 F.Supp.2d 961, 987-88 (N.D. Ill. 2010) (IWRPA claim), *United States ex rel. Batty v. Amerigroup Illinois, Inc.*, 528 F.Supp.2d 86, 876 n. 14 (N.D. Ill. 2007).

III.

Defendants raise numerous arguments for dismissal of Counts I-IV,[4] not all of which require examination. Common among them is the argument that the FAC fails to satisfy Rule 9(b) because it does not identify any specific false claims that were submitted to the government. Several defendants also complain that the FAC improperly lumps defendants together by failing, for example, to specify which defendant allegedly committed which wrongful act(s), by failing to specify which counts are asserted against which defendants, and by asserting claims against defendants to which it attributes no wrongful conduct at all. *See* Care-Provider Entities' Mem. at 9 (DN 87) (observing that the only paragraphs in the FAC to mention entity defendants Carver, Pineville,

---

[4] That is, all counts other than those based on the anti-retaliation provisions of the FCA and the Illinois Whistleblower statute.

11

Broomfield, Cedar City, and St. George by name are those identifying them as parties),[5] Fox Valley's Mem. at 13-14 (DN 84) (noting that none of the FAC's six counts identifies the defendant(s) to which it is directed, and that if Counts I, IV, V and VI are asserted against Fox Valley, each fails because none of the conduct attributed to Fox Valley is prohibited by the Anti-Kickback Statute, the Stark Law, or the North Carolina False Claims Act, nor does it amount to retaliation under the FCA or IWRPA). These arguments have merit. *See U.S. ex rel Walner v. NorthShore University Healthsystem*, 660 F. Supp. 2d 891, 897 (N.D. Ill. 2009) (dismissing *qui tam* action brought under pursuant to the FCA, finding that the relator failed to plead each defendant's "role in the fraud, including but not limited to who submitted the false claim.") (citing *Vicom, Inc. v. Harbridge Merchant Services, Inc.*, 20 F.3d 771, 778 (7th Cir.1994) ("[T]he complaint should inform each defendant of the nature of his alleged participation in the fraud.") (internal citations omitted); *Sears v. Likens,* 912 F.2d 889, 893 (7th Cir. 1990) (affirming dismissal of complaint because it "lump[ed] all the defendants together and [did] not specify who was involved in what activity."); and *Suburban Buick, Inc. v. Gargo,* No. 08 C 0370, 2009 WL 1543709 at *4 (N.D.Ill. May 29, 2009) (Gettleman, J.) ("The complaint should not lump multiple

---

[5] The defendants relator refers to as "SNFs" refer to themselves, in their joint motion, as the "Care-Provider Entities."

defendants together, but should inform each defendant of the specific fraudulent acts that constitute the basis of the action against the particular defendant.") (internal quotations and citations omitted)).

The Care-Provider Entities and physician defendants also decry the FAC's failure, in its allegations relating to self-referrals and bonuses, to identify any patients allegedly referred in violation of the Stark law, or any specifics (such as amounts and dates paid) about bonuses allegedly paid to Whitney Arado. With respect to the allegations that defendants provided improper, unnecessary, or out-of-scope treatment, "upcoded" or double-billed procedures, and "manipulated" or "fabricated" clinical records, several defendants argue that the FAC fails not only to identify any specific claim presented in conjunction with these practices, but also to provide sufficient details—even in paragraphs describing "exemplary" cases—to satisfy Rule 9(b). I agree.

With respect to "Patient Z," for example, the FAC asserts that this individual:

> was hospitalized on April 26, 2007 until May 2, 2007 with a diagnosis of chest pain. After her hospitalization, Patient Z was referred and admitted to Defendant, Arlington, for physical and occupation (sic) therapy that Medicare was subsequently and fraudulently billed for. Patient Z's prior level of functionality did not require any therapy services.

FAC at ¶ 73. This paragraph, the substantive whole of which is reproduced above, is the FAC's only reference to Patient Z. The

13

allegations it contains plainly fall short of pleading fraud under Rule 9(b).  To begin, who referred "Patient Z" to Arlington?  What therapy was provided, by whom, and under whose direction?  On what information did these individuals base their treatment decisions? What is the basis for relator's belief that the therapy was unnecessary?  When, by whom, and for what amount was any claim for payment for these services submitted?  The FAC offers no answer to these questions,[6] without which it fails adequately to allege either that any defendant had the requisite knowledge—the "heightened *mens rea*"—that both the FCA and the underlying Anti-Kickback and Stark statutes require, *U.S. v. Omnicare*, No. 07 C 5777, 2013 WL 3819671, *10 (N.D. Ill. July 23, 2013) (Tharp, J.), or that any false Cost Report or Certification was actually submitted.  "[I]f Rule 9(b) is to be adhered to, some indicia of reliability must be given in the complaint to support the allegation of an actual false claim for payment being made to the Government."  *Clausen*, 290 F.3d at 1311.

Realtor insists that *Lusby* allows claims under the FCA to proceed on allegations that raise a plausible "inference" that false statements were made where evidence of the specific false

---

[6] Relator attempts to cure one of the pleading defects noted here by asserting, in his opposition, that Dr. Tack referred Patient Z to Arlington.  Although I disagree with Dr. Tack's argument that this additional fact contradicts other allegations in the FAC and should not be considered on that basis, its inclusion cures only one of the FAC's multiple pleading deficiencies.

14

statements is outside the relator's reach at the pleading stage. In that case, the alleged false statements related to whether engines that the defendant, Rolls-Royce, sold to the government met certain specifications. The court explained:

> The complaint alleges that five contracts between Rolls-Royce and the United States require all of the engine's parts to meet particular specifications; that the parts did not do so (and the complaint describes tests said to prove this deficiency); that Rolls-Royce knew that the parts were non-compliant (not only because Lusby told his supervisors this but also because audits by Rolls-Royce's design and quality-assurance departments confirmed Lusby's conclusions); and that Rolls-Royce nonetheless certified that the parts met the contracts' specifications. The complaint names specific parts shipped on specific dates, and it relates details of payment.

*Lusby*, 570 F.3d at 853. On these allegations, the court concluded that it was not "essential for [the] relator to produce the invoices (and accompanying representation) at the outset of the suit" (although it acknowledged that this evidence would ultimately be required for the relator to prevail) because the relator's "accusations are not vague. Rolls-Royce has been told exactly what the fraud entails." *Id*. at 854, 55.

The same cannot be said of the defendants here. As noted above, the FAC lumps defendants together—intentionally, as relator explains in his response to defendants' motions—apparently on the assumption that common corporate ownership of the SNFs means that the wrongful conduct relator observed at Arlington must have been committed by each of them. But relator is not entitled to embark

15

on a fishing expedition against thirteen entities (not to mention three individuals) based on the fraud he claims to have witnessed as an employee of one of one of them. *See Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1327 (7th Cir. 1994) (minimizing "fishing expeditions" is one of Rule 9(b)'s "three main purposes").

Moreover, the sparse details relator provides in his "representative examples" of inappropriate patient care and billing (the paragraphs of the FAC that discuss Patients W, X, Y are as light on specifics as the one discussing Patient Z), do not compare to the details provided at the "individualized transaction" level in *Lusby*. *See Fowler*, 496 F.3d at 742. Nor do they compare with the allegations that courts applying *Lusby* have found adequate in cases similar to this one. *See U.S. v. Indianapolis Neurosurgical Group, Inc.,* No. 06-cv-1778-JMS-DML, 2013 WL 652538 (S.D. Ind. Feb. 21, 2013).[7] *See also U.S. ex rel.*

---

[7] The allegations supporting the relators' claim based on "upcoding" (or, in the words of that complaint, "Billing Using Higher Intensity Levels") in *Indianapolis Neurosurgical* begin with an explanation of how different codes are attributed to patient services. They go on to illustrate, using specific data laid out in charts, the distribution of codes the defendants used and the billing rates that resulted from the use of these codes. The relators then explained that the codes reflected rates that were "disproportionately high" in comparison with the services provided, as reflected in the accompanying records. Then, the complaint detailed specific patient examples, which included the dates of services, the names of the physician who treated the patient, the codes used in billing, and an explanation for why the codes were not appropriate to the level of service provided. *See* Second Amended Complaint, ¶¶ 57-63, 06-cv-1778 (S.D. Ind.) (DN 136)

*Upton v. Family Health Network, Inc.*, 900 F. Supp. 2d 821 (N.D. Ill. 2012) (examples of the alleged "cherry picking" scheme to unlawfully exclude certain individuals from publicly funded healthcare plan included allegations about defendants' individual roles in refusing to enroll, or disenrolling, specifically identified individuals based on particular criteria; the dates these individuals tried to enroll but were refused (or were later disenrolled); and individual defendants' statements suggesting that unlawful criteria were being used to deny or revoke their enrollment).

The examples discussed above of relator's failure to plead either the fraudulent conduct or the false claims for payment with the requisite specificity are fatal to the FAC, but they are not the only ways in which the FAC falls short. Other examples abound: As Fox Valley points out, at least one allegedly fraudulent act asserted against it—its podiatrists' provision of services under another physician's name for billing purposes—are pled "upon information and belief," a formulation that fails to meet Rule 9(b) unless the plaintiff also "provides the grounds for his suspicions," which plaintiff has not done here. *Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 443 (7th Cir. 2011) (citation and internal quotation marks omitted). And the FAC is peppered with allegations that clinical and patient records and data were

17

"manipulated," "fabricated," or "falsified," but nowhere does relator tell us what any particular record contained, or what it would have contained if its statements had been truthful. However ominous these allegations sound, they fail to allege fraud with particularity.

Nevertheless these are not flaws that have no hope of a cure. Accordingly, while I dismiss Counts I-III of the FAC (two counts pursuant to the FCA and one pursuant to the IWRPA), dismissal of these counts is not with prejudice.

As for Count IV (relator's claim under the North Carolina False Claims Act), the Care-Provider Entities argue that this claim must be dismissed with prejudice because all of the fraudulent conduct alleged in the complaint precedes the statute's effective date, and that the statute has no retroactive effect. It is true that the statute took effect on January 1, 2010, by which time relator—who claims to be an "original source" and has "direct knowledge" of the information alleged in his claims, was no longer employed at Arlington. Because relator concedes as much by failing to respond to the Care-Provider Entities' argument on this front, Count IV is dismissed with prejudice.

This brings me to counts V and VI, which seek relief under the anti-retaliation provisions of FCA and IWRPA. From the allegations in Count V, it appears that relator asserts this claim against all of the defendants, though relator concedes that these

provisions protect only "employees." Opp. at 13 (DN 89). Nevertheless, relator asserts that "Defendants" retaliated against him, based on his "actions in advising the management of Defendant SNF, Arlington, and other Defendants of their wrong doings and repeated failure to provide true and accurate care to its residents." FAC at ¶ 143.

The Care-Provider Entities correctly argue that these allegations do not adequately plead either that relator engaged in protected activity, or that his employer, defendant Arlington, knew that he did. *Brandon*, 277 F.3d at 944. Relator insists that "he had on multiple occasions communicated to his employer that he disagreed with the flagrant disregard of applicable laws governing claims to Medicare and Medicaid." Opp. at 14. But this argument reinforces that the activities relator claims were protected amounted to no more than non-protected internal complaints. "Simply making internal complaints or pointing out problems to supervisors is not sufficient." *Batty*, 528 F. Supp. 2d at 877. Like the relator in *Batty*, relator brought this action long after his employment was terminated and has failed to allege that the activities he claims to have taken were "in furtherance of" his FCA or IWRPA claims.[8] Accordingly, Claims V and VI are dismissed.

---

[8] I note, in passing, that the FAC alleges that defendants' retaliation "included but was not limited to failure and refusal to cease their fraudulent practices and termination from his employment." If there is any authority to support the argument

IV.

For the foregoing reasons, the FAC is dismissed. Dismissal of Count IV is with prejudice.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated: July 18, 2014

---

that defendants' failure to cease their alleged misconduct amounts to "retaliation," relator has not cited it. Accordingly, I consider his retaliation claims to be based solely upon his termination.