IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| STATE OF ILLINOIS, | ) | Civil Action No. 10-cv-0368 |
| | ) | |
| | ) | Judge Elaine E. Bucklo |
| | ) | |
| Ex rel. RAYMOND DOLAN, | ) | JURY TRIAL DEMANDED |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| LONG GROVE MANOR, INC. d/b/a | ) | |
| ARLINGTON REHABILITATION & LIVING | ) | |
| CENTER, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## SECOND AMENDED COMPLAINT

RELATOR RAYMOND DOLAN brings this action on behalf of the United States Government and the State of Illinois by and through his undersigned attorneys and alleges as follows.

### I.    SUMMARY INTRODUCTION

1.        This is an action by qui tam Relator Raymond Dolan ("Relator Dolan" or "Dolan"), on behalf of the United States Government and the State of Illinois to recover damages and civil penalties and to obtain injunctive relief to redress Defendants' Medicare fraud.  Relator Dolan worked as a Corporate Nurse for the SNFs with his office located at Long Grove Manor, Inc. d/b/a Arlington Rehabilitation & Living Center ("Arlington") from April 2003 to July 30, 2007.  He assisted with care and management issues for the skilled nursing facilities owned and operated by Sigmund Lefkovitz and his family members.  Relator Dolan was privy to intimate details of Defendant businesses and management behaviors.

2.        Medicare pays nursing facilities a daily rate to provide skilled nursing and skilled

1

rehabilitation therapy services to qualifying Medicare patients (or "beneficiaries"). The daily rate that Medicare pays a nursing facility depends heavily on the rehabilitation needs of the beneficiaries. The highest daily rate that Medicare will pay a nursing facility is reserved for those beneficiaries that require "Ultra High" levels of skilled rehabilitation therapy, or a minimum of 720 minutes per week of skilled therapy from at least two therapy disciplines (e.g., physical, occupational, and speech). The Ultra High therapy level is intended for the most clinically complex patients who require rehabilitative therapy well beyond the average amount of service time.

3.      From at least 2003 to the present, Long Grove Manor, Inc. d/b/a Arlington Rehabilitation & Living Center, Aurora Manor, Inc. d/b/a Aurora Rehabilitation & Living Center, Durham III, LLC d/b/a Carver Living Center, Pineville Rehabilitation & Living Center, LLC, Cedar City Nursing Home, LLC d/b/a Kolob Regional Care & Rehabilitation Center of Cedar City, St. George Nursing Home, LLC d/b/a Kolob Care & Rehabilitation Center of St. George, Broomfield Skilled Nursing & Rehabilitation Center LLC, and Willow Ridge of North Carolina, LLC (collectively referred to as "SNFs"), engaged in a systematic scheme to maximize the number of days it billed to Medicare at the Ultra High level.

4.      The SNF's accomplished this by setting aggressive Ultra High-related targets that were completely unrelated to its beneficiaries' actual conditions, diagnoses, or needs. Simply Rehab then reinforced those targets at corporate meetings and presentations, through regular emails and facility visits by corporate personnel, through employee performance evaluations, by imposing action plans on underperforming facilities, and various other means.

5.      As a direct result of corporate pressure to maximize its Ultra High billings, Simply Rehab therapists provided Medicare beneficiaries with excessive amounts of therapy that were not medically reasonable and necessary, and sometimes even harmful. Moreover, instead of providing skilled rehabilitation therapy that was tailored to beneficiaries' particular needs, Simply Rehab

therapists routinely provided generic, non-individualized services that did not (and could not) benefit the beneficiaries. These services were only provided to inflate the SNF's reimbursement rates from Medicare for those beneficiaries.

6.    The SNF's and Simply Rehab's corporate strategy and pressure succeeded in significantly increasing the number of days the SNFs billed at the Ultra High level. By 2006, for example, the SNFs billed nearly 68 percent of its Medicare rehabilitation days at the Ultra High level—a level far in excess of the nationwide Ultra High average of 35 percent among all skilled nursing facilities during that same year. By May of 2007, Arlington billed 87% of their therapy days at Very High and Ultra High resulting in Medicare Part A revenue of $443,100 in that one month for that one facility.

7.    Because the SNF's knowingly submitted false claims to the Medicare programs for medically unreasonable, unnecessary and unskilled therapy services, and used false records and statements to support those false claims, the United States brings this action to recover treble damages and civil penalties under the Federal False Claims Act, 31 U.S.C. §§ 3729-3733 (the "FCA") and the Illinois Whistleblower Reward and Protection Act, 740 ILCS § 175/1 et seq. (the "IWRPA"), and to recover damages and other monetary relief under the common law or equitable theories of unjust enrichment, disgorgement, and payment by mistake.

**II.    PARTIES**

8.    Relator Dolan is a citizen of the State of Illinois. Dolan is a registered nurse with a Bachelor's Degree in nursing BSN as well as a Master's Degree in Health Care Management. Dolan has been board certified in Rehabilitation Nursing since 1986 by the Association of Rehabilitation Nursing, the CRRN. This national certification is a mark of excellence related to management of patients that require rehabilitation services. Dolan also is board certified in Wound Care by the Wound Ostomy Continence Board.

9.      Defendant, Simply Rehab, a contract therapy provider, is a limited liability corporation with its principal place of business in Northbrook, State of Illinois, County of Cook. Simply Rehab was founded by defendant Sigmund Lefkovitz in 2000.  It employs over 100 employees.  Within the ten years prior to the filing of the Complaint, Simply Rehab provided lead therapists to organize skilled therapy programs such as physical, occupational, and speech therapy services at Defendant skilled nursing facilities in Illinois, Colorado, North Carolina and Utah. Simply Rehab also provided licensed therapists and other staff to provide the physical, occupational, and speech therapy services to the skilled nursing facilities' patients.

10.     Defendant, Long Grove Manor, Inc. d/b/a Arlington Rehabilitation & Living Center ("Arlington"), a skilled nursing facility (SNF), is an Illinois corporation with its principal place of business in Long Grove, State of Illinois, County of Lake.  The Arlington is located at 1666 Checker Road in Long Grove, Illinois 60047 and is a 190 bed skilled nursing facility initially certified on March 1, 1996.  Beds in the facility are qualified Medicare/Medicaid beds and the facility had an average of 90 percent occupancy when inspected on September 16, 2004.

11.     Defendant, Aurora Manor, Inc. d/b/a Aurora Rehabilitation & Living Center ("Aurora"), a skilled nursing facility, is an Illinois corporation with its principal place of business in, Aurora, State of Illinois, County of Kane.  Aurora is located at 1601 North Farnsworth Avenue in Aurora, Illinois 60505.  Aurora is a 195 bed skilled nursing facility initially certified on June 1, 1973.  One hundred eighty-five of the beds are qualified Medicare/Medicaid beds.  The facility had an average of 90 percent occupancy when inspected on March 16, 2005.

12.     Defendant, Durham III, LLC d/b/a Carver Living Center ("Carver") is incorporated in North Carolina, doing business in the State of North Carolina, County of Durham.  Carver Living Center is a 272 bed skilled nursing facility located at 1303 East Carver Street in Durham, North Carolina 27704.  The facility was initially certified on April 12, 1993 and Carver

administrators have included Shannon Smithey, Greg Kennedy, and Pam Marion.

13.     Defendant, Pineville Rehabilitation & Living Center, LLC. ("Pineville") is an Illinois limited liability corporation, doing business in Long Grove, State of Illinois, County of Lake.  Pineville is a 136 bed skilled nursing facility located at 1010 Lakeview Drive, in Pineville, North Carolina 28134.  The facility was initially certified on March 2, 1992 and was administered by Pam Locklear.

14.     Defendant, Cedar City Nursing Home, LLC d/b/a Kolob Regional Care & Rehabilitation Center of Cedar City ("Cedar City") is incorporated in Utah, doing business in the State of Utah, County of Iron.  Cedar City is a 120 bed skilled nursing facility located at 411 West 1325 North, in Cedar City, Utah 84720.  The facility was initially certified on September 18, 1996 and was administered by Glade Hamilton.

15.     Defendant, St. George Nursing Home, LLC d/b/a Kolob Care & Rehabilitation Center of St. George ("St. George") is incorporated in Utah, doing business in the State of Utah, County of Washington.  Kolob Care & Rehabilitation of St. George, is a 180 bed skilled nursing facility located at 178 South 1200 East in St. George, Utah 84790.  The facility was initially certified on June 7, 2001 and has been administered by Paul Andersen and Jerry Olson.  The facility had an average of 78 percent occupancy when inspected on May 26, 2005.

16.     Defendant, Broomfield Skilled Nursing & Rehabilitation Center LLC ("Broomfield") is an Illinois limited liability company.  Broomfield is located at 12975 Sheridan Boulevard, in Broomfield, Colorado 80020 and was initially certified on March 6, 2002. Broomfield is a 180 bed skilled nursing and rehabilitation facility and has an average payer mix of 60 percent Medicaid, 20 percent Medicare, 5 percent Veterans Affairs, and 15 percent private paid.

17.     Defendant, Willow Ridge of North Carolina, LLC ("Willow Ridge ") is incorporated in North Carolina.  Willow Ridge is a 150 bed skilled nursing facility located at 237

Tryon Road in Rutherfordton, North Carolina 28139, County of Rutherford. The facility was initially certified on March 6, 1980 and has been administered by Ashley Ledford, Randy Smithey, Ashley Smithey, and Greg Kennedy. The facility had an average of 92 percent occupancy when inspected on May 12, 2005.

18.     The Defendants named in paragraphs 10 through 17 will be hereinafter referred to collectively as "SNFs." In many instances, the Defendant SNFs shared common principal places of business, common employees, common registered agents, common owners—often Lefkovitz family members—and utilized the services of common independent contractors.

19.     Defendant, Dr. Yakov Ryabov, is a physician duly licensed to practice medicine in the State of Illinois. His primary office location is 201 East Strong Street, Suite 9 in Wheeling, Illinois 60090.

20.     Defendant, Dr. Stanford R. Tack, is a physician duly licensed to practice medicine in the State of Illinois. Dr. Tack was retained as medical director for the Arlington while maintaining his position with Illinois Bone and Joint Institute ("IBJI") as an orthopedic surgeon.

21.     Defendant, Dr. Kalpesh Patel, was a physician duly licensed to practice medicine in the State of Illinois.

22.     Defendant, Fox Valley Wound Care Associates P.C. ("Fox Valley"), a wound care clinic, is an Illinois corporation with its principal place of business in, Aurora, State of Illinois, County of Kane, located at 1300 North Highland Ave, Suite 7 in Aurora, Illinois 60506. John Lamiot, DPM and Peter Tsang, DPM are podiatrists licensed to practice in Illinois and are part of Fox Valley.

### III.     JURISDICTION AND VENUE

23.     This action arises under the Federal False Claims Act, 31 U.S.C. §§ 3729-3733 (the "FCA"), the Anti-Kickback Statute (the "AKS") and Stark for false claims made to the Federal

Government by defendants, 42 U.S.C. §1320a-7b(b), 42 U.S.C. §1395nn(h)(6), and 42 CFR §411.353, and the Illinois Whistleblower Reward and Protection Act, 740 ILCS § 175/1 et seq (the "IWRPA").

24.     This Court maintains subject matter jurisdiction in this action pursuant to 31 U.S.C. § 3732(a) (FCA) and 28 U.S.C. § 1331 (Federal Question).

25.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), because at all relevant times most of the Defendants conducted substantial business, maintained employees, are located in, and committed acts prohibited by 31 U.S.C. § 3729 in this District.

26.     Before filing his original complaint, Relator Dolan served a copy of same upon the United States together with a written disclosure statement setting forth and enclosing all material evidence and information he possesses, pursuant to the requirements of 31 U.S.C. § 3730(b)(2).

27.     This suit is not based upon prior public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, lawsuit or investigation; in a Government Accountability Office or Auditor General's report, hearing, audit, investigation; in the news media; or in any other location as the term "publicly disclosed" is defined in 31 U.S.C. § 3730 (e)(4)(A).

28.     To the extent that there has been a public disclosure unknown to Relator Dolan, he is an original source under 31 U.S.C. § 3730(e)(4) and 740 Ill. Comp. Stat. § 175/4(e)(4).  Relator Dolan has direct knowledge of the information on which the allegations are based, and has voluntarily provided the information to the Federal and Illinois governments before filing this qui tam action based on that information.  See 31 U.S.C. § 3730(b)(2); 740 Ill. Comp. Stat. § 175/4(b)(2).

**IV.     THE MEDICARE PROGRAM**

    **A.     MEDICARE COVERAGE OF SKILLED NURSING FACILITY REHABILITATION THERAPY**

29.     Congress established the Medicare Program in 1965 to provide health insurance

coverage for people age 65 or older and for people with certain disabilities or afflictions. See 42 U.S.C. §§ 426, 426A. Title XVIII of the Social Security Act (the Act), § 1862(a)(1)(A), states that no payment may be made under Part A or Part B of Medicare for items or services that are not reasonable and necessary for the diagnosis or treatment of illness or injury or for improving the functioning of a malformed body member.

30. The Medicare program is divided into four "parts" that cover different services. Medicare Part A generally covers inpatient hospital services, home health and hospice care, and skilled nursing and rehabilitation care.

31. Subject to certain conditions, Medicare Part A covers up to 100 days of skilled nursing and rehabilitation care for a benefit period (i.e., spell of illness) following a qualifying hospital stay of at least three consecutive days. 42 U.S.C. § 1395d(a)(2)(A); 42 C.F.R. §409.61(b), (c).

32. The conditions that Medicare imposes on its Part A skilled nursing facility ("SNF") benefit include: (1) that the patient requires skilled nursing care or skilled rehabilitation services (or both) on a daily basis, (2) that the daily skilled services must be services that, as a practical matter, can only be provided in a skilled nursing facility on an inpatient basis, and (3) that the services are provided to address a condition for which the patient received treatment during a qualifying hospital stay or that arose while the patient was receiving care in a skilled nursing facility (for a condition treated during the hospital stay). 42 U.S.C. § 1395f(a)(2)(B); 42 C.F.R. § 409.31(b).

33. Pursuant to 42 CFR § 409.44(c)(2), for physical and occupational therapy and speech-language pathology to be reasonable and necessary, certain conditions must be met, including the following:

> There must be an expectation that the beneficiary's condition will improve materially in a reasonable (and generally predictable) period of time based on the physician's assessment of the beneficiary's restoration potential and unique medical condition, or the services must be necessary to establish a safe and effective maintenance program required in connection with a specific disease, or the skills of a therapist must be necessary to perform a safe and effective maintenance program.

In addition, the "amount, frequency, and duration of the services must be reasonable."

34.     Medicare requires that a physician or certain other practitioners certify that these conditions are met at the time of a patient's admission to the nursing facility and to re-certify to the patient's continued need for skilled rehabilitation therapy services at regular intervals thereafter. *See,* 42 U.S.C. § 1395f(a)(2)(B); Medicare General Information, Eligibility, and Entitlement Manual, Ch. 4, § 40.3.

35.     To be considered a skilled service, it must be "so inherently complex that it can be safely and effectively performed only by, or under the supervision of, professional or technical personnel," 42 C.F.R. § 409.32(a), such as physical therapists, occupational therapists, or speech pathologists. *See,* 42 C.F.R. § 409.31(a).

36.     Skilled rehabilitation therapy generally does not include personal care services, such as the general supervision of exercises that have already been taught to a patient or the performance of repetitive exercises (e.g., exercises to improve gait, maintain strength or endurance, or assistive walking). *See,* 42 C.F.R. § 409.33(d).   "Many skilled nursing facility inpatients do not require skilled physical therapy services but do require services, which are routine in nature.  Those services can be performed by supportive personnel; e.g., aides or nursing personnel . . . ."  Medicare Benefit Policy Manual, Chapter 8, § 30.4.1.1.

37.     Medicare Part A will only cover those services that are reasonable and necessary. *See,* 42 U.S.C. § 1395y(a)(1)(A); *see also,* 42 U.S.C. § 1320c-5(a)(1) (providers must assure that they provide services economically and only when, and to the extent, medically necessary) ; 42

U.S.C. § 1320c-5(a)(2) (services provided must be of a quality which meets professionally recognized standards of health care).

37.    In the context of skilled rehabilitation therapy, this means that the services furnished must be consistent with the nature and severity of the patient's individual illness, injury, or particular medical needs; must be consistent with accepted standards of medical practice; and must be reasonable in terms of duration and quantity.  *See*, Medicare Benefit Policy Manual, Ch. 8, § 30.

38.    In order to assess the reasonableness and necessity of those services and whether reimbursement is appropriate, Medicare requires proper and complete documentation of the services rendered to beneficiaries. In particular, the Medicare statute provides that:

> No payment shall be made to any provider of services or other person under this part unless there has been furnished such information as may be necessary in order to determine the amounts due such provider or other person under this part for the period with respect to which the amounts are being paid or for any prior period.

42 U.S.C. § 1395l(e).

### B.    MEDICARE PAYMENT FOR SKILLED NURSING FACILITY REHABILITATION THERAPY

39.    Under its prospective payment system ("PPS"), Medicare pays a nursing facility a pre-determined daily rate for each day of skilled nursing and rehabilitation services it provides to a patient.  *See,* 63 Fed. Reg. 26,252, 26,259-60 (May 12, 1998).

40.    The daily PPS rate that Medicare pays a nursing facility depends, in part, on the Resource Utilization Group (RUG) to which a patient is assigned. Each distinct RUG is intended to reflect the anticipated costs associated with providing nursing and rehabilitation services to beneficiaries with similar characteristics or resource needs.  From January 1, 2006, to October 1, 2010, there were 53 RUGs in the so called "RUG-III" classification system.  *See,* 70 Fed. Reg. 45,026, 45,031 (Aug. 4, 2005).

41.     There are generally five rehabilitation RUG levels for those beneficiaries that require rehabilitation therapy: Rehab Ultra High (known as "RU"), Rehab Very High ("RV"), Rehab High ("RH"), Rehab Medium ("RM"), and Rehab Low ("RL").

42.     The rehabilitation RUG level to which a patient is assigned depends upon the number of skilled therapy minutes a patient received and the number of therapy disciplines the patient received during a seven-day assessment period (known as the "look back period"). The chart below reflects the requirements for the five rehabilitation RUG levels under the RUG-III classification system.

| Rehabilitation RUG Level | Requirements to Attain RUG Level |
|---|---|
| RU = Ultra high | minimum 720 minutes per week total therapy combined from at least two therapy disciplines; one therapy discipline must be provided at least 5 days per week |
| RV = Very high | minimum 500 minutes per week total therapy; one therapy discipline must be provided at least 5 days per week |
| RH = High | minimum 325 minutes per week total therapy; one therapy discipline must be provided at least 5 days per week |
| RM = Medium | minimum 150 minutes per week total therapy; must be provided at least 5 days per week but can be any mix of therapy disciplines |
| RL = Low | minimum 45 minutes per week total therapy; must be provided at least 3 days per week but can be any mix of therapy disciplines |

Source: 63 Fed. Reg. at 26,262

43.     Medicare pays facilities the most for those beneficiaries that fall into the Ultra High RUG level. The Ultra High ("RU") RUG level is "intended to apply only to the most complex cases requiring rehabilitative therapy well above the average amount of service time." 63 Fed. Reg. 26,252, 26,258 (May 12, 1998).

44.     In addition to reflecting a patient's rehabilitation therapy needs, each RUG also reflects the patient's ability to perform certain activities of daily living ("ADL"), like eating, toileting, bed mobility and transfers (e.g., from a bed to a chair). A patient's ADL score (ranging from A to C) reflects his or her dependency level when performing an ADL. A very dependent patient, who cannot perform any of the ADLs without assistance, would generally receive an ADL score of "C," while a patient who could perform the ADLs without assistance would receive an ADL score of "A."

45.     In addition to the ADL scores of A, B, and C, Medicare provides "X" and "L" ADL scores for those beneficiaries that require "extensive services" in addition to rehabilitation therapy. Extensive services include intravenous treatment, ventilator or tracheostomy care, or suctioning. A very dependent rehabilitation patient who requires more extensive services would generally receive an ADL score of "X," while a patient who needs only one of the extensive services might receive an ADL score of "L."

46.     To provide a sense of the tremendous impact that a RUG level or ADL score has on the Medicare daily rate, provided below is a summary chart reflecting the adjusted rates that Medicare paid nursing facilities for rehabilitation beneficiaries in fiscal year 2006. Medicare adjusts base rates annually and based on locality. *See*, 42 U.S.C. § 1395yy(e)(4)(E)(ii)(IV).

| RUG Rates: Federal Rates for Fiscal Year 2006 | | | | |
|---|---|---|---|---|
| | Rehab with Extensive Services | | Rehab without Extensive Services | | |
| RUG Level | X | L | C | B | A |
| RU | $564.83 | $496.04 | $479.53 | $439.62 | $418.99 |
| RV | $428.24 | $399.34 | $385.59 | $366.32 | $329.17 |
| RH | $363.02 | $356.14 | $335.50 | $320.36 | $296.97 |
| RM | $415.57 | $381.17 | $308.25 | $299.99 | $293.11 |
| RL | $295.03 | N/A | N/A | $271.64 | $231.74 |

47.     CMS has made certain modifications to the RUG-III structure through its RUG-IV classification system, which became effective October 1, 2010.  CMS added new clinical RUG categories, modified the timeframe in which each assessment must be performed, required that nursing facilities assess changes in the level of therapy every seven days, and revised certain rules pertaining to group therapy, among other changes.  74 Fed. Reg. 40,288 (Aug. 11, 2009).

### C.     STATEMENTS AND CLAIMS TO MEDICARE FOR PAYMENT OF SKILLED NURSING FACILITY REHABILITATION THERAPY

48.     Pursuant to 42 CFR § 424.20, SNF patients must be correctly assigned to the RUG category that represents the required level of care.  Further, 42 CFR § 413.343(b) requires periodic assessments (e.g., on the 5th and 14th days of post-hospital SNF care) and such other assessments that are necessary to account for changes in patient care needs.

49.     Medicare requires nursing facilities periodically to assess each patient's clinical condition, functional status, and expected and actual use of services, and to report the results of those assessments using a standardized tool known as the Minimum Data Set ("MDS").  The MDS is used as the basis for determining a patient's RUG level and, therefore, the daily rate that Medicare will pay a nursing facility to provide skilled nursing and therapy to that patient.

49.     In general, a nursing facility must assess each patient and complete the MDS form on the 5th, 14th, 30th, 60th, and 90th day of the patient's Medicare Part A stay in the facility. The date the facility performs the assessment is known as the assessment reference date. A nursing facility may perform the assessment within a window of time before this date, or, under certain circumstances, up to five days after. When a nursing facility performs its assessment (except for the first assessment), it looks at the patient for the seven days preceding the assessment reference date. As discussed above, this seven day assessment period is referred to as the "look-back period."

50.     The MDS collects clinical information on over a dozen criteria, including hearing, speech, and vision; cognitive patterns; health conditions; and nutritional and dental status.  Section P of the MDS ("Special Treatments and Procedures") collects information on how much and what kind of skilled rehabilitation therapy the facility provided to a patient during the look- back period.  In particular, Section P shows how many days and minutes of therapy a nursing facility provided to a patient in each therapy discipline (i.e., physical therapy, occupational therapy, and speech-language pathology and audiology services).  As discussed below, the information contained in Section P directly impacts the rehabilitation RUG level to which a patient will be assigned.

51.     In most instances, the RUG level determines Medicare payment prospectively for a defined period of time. *See,* 63 Fed. Reg. at 26,267.  For example, if a patient is assessed on day 14 of his stay, and received 720 minutes of therapy during days 7 through 14 of the stay, then the facility will be paid for the patient at the Ultra High RUG level for days 15 through 30 of the patient1's stay.

52.     Prior to October 1, 2010, the nursing facility would electronically transmit the MDS form to a state's health department or other appropriate agency, which in turn would transmit the data to CMS.  42 C.F.R. § 483.20(f)(3) (2008); 42 C.F.R. § 483.315(h)(1)(v) (2008).  Since October 1, 2010, nursing facilities transmit the data directly to CMS.  42 C.F.R. § 483.20(f)(3).

53.     Completion of the MDS is a prerequisite to payment under Medicare.  *See,* 63 Fed. Reg. at 26,265.  The MDS itself requires a certification by the provider that states, in part: "To the best of my knowledge, this information was collected in accordance with applicable

---

[1] Payment for days 1 through 14 is based on the number of therapy minutes provided through the five-day assessment, as well as an estimate of the number of minutes to be provided through day 14.  *See* 63 Fed. Reg. at 26,265-67; 64 Fed. Reg. at 41,662.

Medicare and Medicaid requirements. I understand that this information is used as a basis for ensuring that residents receive appropriate and quality care, and as a basis for payment from federal funds." Minimum Data Set (MDS) – Version 2.0 for Nursing Home Resident Assessment and Care Screening.

54.    A patient's RUG information is incorporated into the Health Insurance Prospective Payment System (HIPPS) code, which Medicare uses to determine the payment amount owed to the nursing facility. The HIPPS code must be included the CMS-1450, which nursing facilities submit electronically to Medicare for payment. Medicare Claims Processing Manual, Ch. 25, § 75.5.  Medicare payment will depend largely on the HIPPS code the nursing facility submitted as part of the CMS-1450.  *See,* 63 Fed. Reg. at 26,267; Medicare Claims Processing Manual, Ch. 25, § 75.5.

55.    Skilled nursing facilities submit the CMS-1450 electronically under Medicare Part A to Medicare payment processors, known as Medicare Administrative Contractors ("MACs"), formerly known as Fiscal Intermediaries ("FIs").  MACs process and pay Medicare claims.

## V.    SIMPLY REHAB SYSTEMICALLY PRESSURED ITS REHABILITATION THERAPISTS TO MEET CORPORATE ULTRA HIGH AND AVERAGE LENGTH OF STAY TARGETS IN ORDER TO MAXIMIZE MEDICARE REVENUE

56.    As CEO and shareholder of Simply Rehab for most of the relevant period, Bob Kunio acted as the top of Simply Rehab's corporate rehabilitation therapy hierarchy.

57.    Patrick Finn was a 25% shareholder in Simply Rehab.  Mr. Finn was also the SNFs' Administrators direct supervisor from 2000 to 2009.

58.    Whitney Arado was the SNFs' Director of Business Development & Marketing.

59.    Because Medicare pays significantly higher reimbursement rates for Ultra High

15

and Very High beneficiaries than for beneficiaries at lower RUG levels, Mr. Finn, Ms. Arado, Mr. Kunio, and other SNF shareholders aggressively pushed their facilities and therapists to get as many of their Medicare beneficiaries into the highest RUG categories. They set and enforced aggressive targets for the percentage of Medicare rehabilitation days the facilities had to bill at the Ultra High RUG level.

60.     "Average length of stay" refers to the average number of days that a beneficiary stayed at the facility. As described above, Medicare pays nursing facilities, per patient, per day. Mr. Finn, Ms. Arado, Mr. Kunio, and other SNF shareholders each also pressured their facilities and therapists to extend their Medicare beneficiaries' stays in the facilities to maximize Medicare revenue.

61.     This practice often resulted in beneficiaries unnecessarily exhausting all 100 days of their Medicare SNF benefit and leaving the beneficiaries with no Medicare Part A coverage for at least 60 days if the beneficiaries later actually needed skilled nursing or rehabilitation care.

62.     These corporate pressures caused Simply Rehab therapists to provide excessive amounts of therapy that were neither medically reasonable nor necessary. Because the corporate targets were based in part on providing a specific number of therapy minutes per Medicare patient, the therapists rarely develop individualized plans of care for patients. Simply Rehab therapists also provided services that did not qualify as skilled rehabilitation therapy simply to meet the demands of higher Ultra High targets.

63.     As Mr. Kunio explained on Simply Rehab's website an example of how Simply Rehab could raise a SNF's rates "[Prospective Payment System] 101 for Therapists" guidance, the "bottom line" on RUG levels is that the "therapists are determining how much

16

reimbursement the facility will receive for each individual patient," and "[t]he more minutes a patient can tolerate, the more money the facility can get reimbursed for." Mr. Kunio advertised that Simply Rehab increases "the percentage of Med-A days that are Ultra High for the long-term care population in the nursing homes we serve" and increased facility reimbursement. Available at www.simplyrehab.com/longterm.htm.

64. Dolan had the opportunity to witness Mr. Kunio and SNF management pressure to increase Medicare revenues on each facility during his facility visits. He frequently visited the Illinois SNFs.

65. He also traveled to the following SNFs in 2003: May 13, 2003-May 15, 2003 Kolob; May 27, 2003-May 28, 2003 Carver; June 3, 2003-June 4, 2003 Broomfield; July 15, 2003-July 18, 2003 Pineville, Willow Ridge & Carver; August 4, 2003-August 7, 2003 Kolob; August 19, 2003-August 21, 2003 Carver; September 2, 2003-September 12, 2003 Kolob; September 17, 2003-September 19, 2003 Broomfield; September 23, 2003-September 25, 2003 Pineville; September 29, 2003-October 1, 2003 Broomfield; October 19, 2003-October 25, 2003 Kolob; October 31, 2003-November 5, 2003 Kolob; and December 8, 2003-December 10, 2003 Broomfield.

66. Dolan performed the following SNF visits in 2004: January 21, 2004-January 23, 2004 Broomfield; March 1, 2004-March 5, 2004 Kolob; March 11, 2004-March 12, 2004 Carver; April 6, 2004-April 7, 2004 Broomfield; April 19, 2004-April 25, 2004 Kolob; July 25, 2004-July 28, 2004 Carver & Willow Ridge; August 24, 2004-August 25, 2004 Carver; September 13, 2004 Carver; October 4, 2004-October 6, 2004 Pineville; October 12, 2004-October 13, 2004 Broomfield; November 6, 2004-November 11, 2004 Kolob; November 15, 2004-November 17, 2004 Pineville; November 21, 2004-November 24, 2004 Broomfield;

November 30, 2004-December 1, 2004 Carver; and December 12, 2004-December 14, 2004 Carver.

67.     In 2005, Dolan traveled to the following SNFs:  January 10, 2005-January 14, 2005 Pineville & Willow Ridge; January 19, 2005-January 20, 2005 Broomfield; January 25, 2005-January 27, 2005 Pineville; March 21, 2005-March 22, 2005 Pineville; April 19, 2005-April 21, 2005 Carver; April 25, 2005-April 28, 2005 Pineville; May 9, 2005-May 13, 2005 Kolob; May 23, 2005-May 25, 2005 Carver; June 1, 2005-June 3, 2005 Broomfield; August 29, 2005-August 31, 2005 Pineville & Willow Ridge; September 6, 2005-September 7, 2005 Kolob; September 13, 2005-September 14, 2005 Broomfield; September 19, 2005-September 22, 2005 Carver & Willow Ridge; October 9, 2005-October 10, 2005 Carver; October 12, 2005-October 14, 2005 Broomfield; October 18, 2005-October 20, 2005 Carver; November 1, 2005-November 4, 2005 Pineville & Willow Ridge; November 8, 2005-November 10, 2005 Carver; December 7, 2005-December 9, 2005 Broomfield; and December 14, 2005-December 15, 2005 Pineville.

68.     Dolan traveled to the following SNFs in 2006:  May 3, 2006-May 4, 2006 Pineville; May 6, 2006-May 11, 2006 Kolob; June 8, 2006-June 9, 2006 Broomfield; September 13, 2006-September 14, 2006 Broomfield; September 26, 2006-September 28, 2006 Carver, Willow Ridge & Pineville; October 19, 2006-October 23, 2006 Kolob; November 10, 2006-November 14, 2006 Broomfield; November 28, 2006-November 30, 2006 Pineville; and December 17, 2006-December 19, 2006 Kolob & Broomfield.

69.     In 2007, Dolan visited the following SNFs:  January 7, 2007-January 8, 2007 Broomfield; January 15, 2007-January 17, 2007 Carver; January 24, 2007-January 27, 2007 Kolob; February 12, 2007-February 14, 2007 Pineville; February 17, 2007-February 21, 2007 Broomfield; March 13, 2007-March 16, 2007 Broomfield & Kolob; April 24, 2007-April 25,

2007 Broomfield[2]; May 2, 2007-May 3, 2007 Pineville; May 9, 2007-May 12, 2007 Kolob; May 15, 2007-May 17, 2007 Carver; May 22, 2007-May 25, 2007 Broomfield; June 7, 2007-June 8, 2007 Broomfield; and June 18, 2007-June 21, 2007 Kolob.

### A. SIMPLY REHAB & THE SNFs' REHABILITATION THERAPY HIERARCHY

70.     Given the importance of therapy minutes to its beneficiaries' RUG levels and therefore its own Medicare revenues, Simply Rehab closely managed the productivity levels of its rehabilitation therapists.  Mr. Kunio established staffing budgets to accomplish enough therapists to provide 85% Medicare A patients at Ultra High and 25% Medicare part B patients. Kunio then further developed bonus program for up to 105% efficiency. Simply Rehab often requires that its therapists perform an unrealistic number of therapy minutes, leaving them little choice but to attempt to perform therapy on several patients at once. Therapists were forced to use non skilled Rehab techs to perform group sessions in order to meet the facility demands for Ultra High Therapy for their patients.

71.     Simply Rehab generated numerous reports (*e.g.,* monthly rehabilitation snapshot reports, 12-month key indicator reports, and Medicare book rate reports) that closely tracked, among other things, the SNFs' Ultra High percentages, average length of stay levels, and the productivity levels of its facilities at every level of the corporate hierarchy.

72.     During most of the relevant period, Mr. Finn, Ms. Arado, Mr. Kunio, and other SNF shareholders aggressively drove the SNFs and Simply Rehab to increase their Medicare revenues.  As Ms. Arado frequently told the SNFs' employees, their jobs were to increase

---

[2] During this visit to Broomfield, Dolan reviewed the therapy patients currently on case load at the SNF.  While reviewing patients with Pam Rodgers PT, Dolan determined that almost every patient was receiving Ultra High therapy. The patients consisted of new patients as well as re-admissions of long-term patients post-illness.  Ms. Rodgers revealed that Mr. Kunio directed that all patients were to receive Ultra High therapy level.  Dolan reviewed the medical records and therapy at the Ultra High level was not necessary as it related to the patients illness, diagnosis, or physical condition.

Medicare census for the SNFs' shareholders.

73.     During the relevant period, Simply Rehab divided its facilities into several divisions across the country.  These included the Central, Western, and Eastern facilities.

74.     Divisional personnel included a regional director for each of the three regions, Regional Rehab Directors.  Regional Rehab Directors reported directly to Mr. Kunio and managed the staff within their respective divisions.  Mr. Kunio communicated and reinforced the Ultra High RUG and average length of stay targets through emails to these Regional Rehab Directors.  Such emails frequently included monthly "Rehab Key Indicators" reports, which tracked the performance of every facility using metrics like Ultra High percentages and rehabilitation length of stay.  Mr. Kunio also regularly visited the SNFs.

75.     Troy Tagimacruz OTR, Pat Gauthier OTR, and Tasha Weatherspoon OTR were each Regional Rehab Directors.  Each Regional Rehab Director managed the Rehabilitation Services Managers ("Rehab Manager") assigned to the individual facilities within his or her region.  Although they reviewed a number of factors, the Regional Rehab Directors focused particularly on pushing the facilities to increase the number of Ultra High billable minutes.

76.     The SNF's Rehab Manager was the person primarily responsible for managing the rehabilitation therapy staff at each facility and for ensuring that the therapists met the Ultra High and average length of stay targets.  Simply Rehab's Rehab Managers included but were not limited to the following individuals during Dolan's employment with the SNFs: Dennis Candelara (Arlington), Jeff Olen (Arlington), Jennifer Marchbanks (Aurora), Phillip Miller (Carver), and Pam Rodgers (Broomfield).

77.     Although stationed at each facility, the Rehab Manager reported to and was evaluated by his or her Regional Rehab Director.  Rehab Managers, who were usually trained in

only one therapy discipline, set the number of skilled therapy minutes for all therapy disciplines that the therapists had to provide each day to the Medicare beneficiaries. Some Rehab Managers instructed their therapists to assign patients to the Ultra High RUG category regardless of the patients' diagnosis, physical ability, or current health status. Rehab Managers regularly set the number of assigned minutes without input from the therapists and sometimes even over the express objections and recommendations of the therapists. Rehab Managers received criticism if their facilities failed to meet their targets and they provided guidance to the facilities on therapeutic techniques they could employ to help increase their billable therapy minutes.

78.     The Rehab Manager also reported to the SNF's Administrator (also known as the Executive Director), who was in charge of the entire SNF facility. The Executive Director, in turn, reported to Patrick Finn and James Mann, shareholders in the SNFs. The Executive Directors typically had no training or certification in skilled rehabilitation therapy, but they often took an active role in setting and achieving rehab targets for individual beneficiaries and enforcing corporate Ultra High and average length of stay targets.

79.     The therapy staff of each facility was comprised of physical therapists, physical therapy assistants ("PTAs"), occupational therapists, certified occupational therapy assistants ("COTAs"), and speech-language and pathology therapists. Some rehab departments also employed physical therapy aides, unlicensed personnel who typically could not perform skilled therapy services – if at all – without supervision. Many SNFs also employed either directly or through a third-party company contract therapists and/or therapy assistants, who would provide additional therapy staffing on an as-needed basis.

80.     Lastly, each SNF employed at least one MDS coordinator. The MDS coordinator, usually a registered nurse, was supposed to be responsible for, among other things,

collecting all the information needed for the MDS and determining the assessment reference date and the seven-day look-back period that would be used to determine each patient's RUG level. In practice, however, the Rehab Manager would often overrule the MDS coordinator and determine the assessment reference date, choosing the days that would result in the highest RUG level, and thus, the highest payment to the SNF.

81.     The SNFs submitted the MDS forms to the appropriate state agencies (prior to October 2010) and then CMS (after October 2010) with the intention that Medicare would rely upon the MDS information to set patient RUG levels and pay claims based on those patient RUG levels.

82.     As part of Simply Rehab and the SNFs' push in 2006 for increased Medicare revenues, Mr. Finn and Mr. Mann, established a standard of $450 per patient per pay expectation—a rate associated with the Ultra High RUG category.  Simply Rehab also had a tracking tool that demonstrated facility productivity which included logs generally describe the average daily rate at which a nursing facility bills Medicare for its Medicare beneficiaries. As a practical matter, it was extremely difficult to achieve a daily Medicare rate of $450 in 2006 without billing a significant percentage of days at the Ultra High RUG level.  Sherri Cohagan, Chief Financial Officer of the SNFs, created summaries of each SNF's monthly progress.

83.     The SNFs' management also communicated and reinforced these Ultra High RUG and length of stay targets through site visits to each SNF and regional meeting presentations.

84.     In a January 2007 meeting at Broomfield, Ms. Arado discussed an action plan to slow the discharges of patients back to the community with Broomfield's Director of Marketing, Administrator, and Rehab Manager.  Ms. Arado directed the staff at Broomfield to spread out the

discharges so as to keep the Medicare census consistent. Broomfield staff followed Ms. Arado's direction and as a result patients were kept longer, even though the therapist had documented that the patients' goals were met and discharge from the SNF was appropriate. Dolan monitored Broomfield's Medicare activity which revealed that the Broomfield staff complied with Ms. Arado's direction to delay Medicare patient discharges.

85.     In Western Division meetings at Cedar City and Kolob Care & Rehabilitation Center of St. George, the SNFs were told to achieve the same reimbursement level as Broomfield, $450 per day. It was the Regional Rehab Director and each SNF's Rehab Manager's responsibility to accomplish that goal.

86.     During Eastern Division meetings at Pineville, Mr. Finn communicated targets to ensure an increase in the percentage of Ultra High days billed and the average lengths of stay. Mr. Finn specifically directed Pam Lockler, Pineville's Administrator, to increase Medicare Part A length of stay as well achieve a daily rate closer to the Broomfield facility of $450 per day per patient.

87.     Simply Rehab implemented special initiatives to increase Ultra High RUG levels and Medicare revenues in the SNFs in which they provided therapy. Mr. Kunio created elaborate bonus programs to reward therapist as well as Regional Rehab Directors to increase total therapies and revenue to Simply Rehab shareholders.

88.     Simply Rehab measured the performance of its employees at every level of the company, in part, on their ability to achieve Ultra High targets. Per Mr. Kunio's instructions, if a therapist failed to achieve the number of assigned minutes, Rehab Managers commonly added the missed minutes to the target minutes for the following day in order to ensure that the overall number of assigned minutes was met.

89.     For example, Simply Rehab evaluated Jennifer Marchbanks (formerly Jones) OTR in relation to what Simply Rehab considered low patient RUG levels. Affidavit of Jennifer Marchbanks is attached and has been marked as Exhibit A. She was placed on an action plan to improve the therapy usage at Aurora. Ms. Marchbanks was not willing and unable to meet Mr. Kunio's specified targets and was fired in 2007. In her affidavit, Ms. Marchbanks corroborates Dolan's allegations regarding Simply Rehab and the SNFs Medicare revenue schemes.

**B.     SIMPLY REHAB PROVIDED EXCESSIVE THERAPY SERVICES WITH LIMITED PHYSICIAN OVERSIGHT, KNOWLEDGE, OR INVOLVEMENT**

90.     Medicare requires that physicians or certain other practitioners certify, and then re-certify on a regular basis, to the medical necessity of a patient's treatment in a skilled nursing facility. A physician must also sign written orders for therapy- before the therapy starts- which typically includes approving the therapy plan of care or the frequency and duration of therapy.

91.     In practice, physicians commonly signed certifications days or a week after the patient was admitted, or sometimes did not sign at all. Rather than the physician evaluating the patient, or talking with the therapist who had performed an evaluation, and then prescribing an order for the duration and frequency of therapy, Simply Rehab therapists would frequently begin therapy treatments, then write up the therapy orders and only then obtain physician approval. Typically, physicians would approve the therapy over the phone, and then sign the order written by the therapist without ever having met the patient or performed an independent evaluation.

92.     Many physicians, who often lacked knowledge and training in rehabilitation therapy, relied heavily on therapists to propose a frequency and duration of therapy that was appropriate for the individual patient, not knowing that Simply Rehab had actually set those amounts to meet corporate target RUG levels based on revenue related goals. Physicians often signed stacks of certifications and therapy orders without seeing the patients or talking with the

therapists, and never knowing whether the therapy was reasonable, useful, or even medically necessary.

93.     Some physicians pre-signed their certifications and allowed the facility to fill in the therapy orders they wanted.  Most of the SNFs' physicians used a standard, universal prescription for therapy that they ordered on the certifications for every patient, regardless of medical necessity.

## VI.     THE SNFs BILLED MEDICARE FOR SERVICES THAT WERE MEDICALLY UNREASONABLE, UNNECESSARY, AND UNSKILLED

94.     In order to meet Simply Rehab and the SNFs' aggressive Ultra High RUG and average length of stay targets, Simply Rehab therapists frequently provided services that were medically unreasonable, unnecessary, and unskilled.  Instead of developing individualized plans of care that were tailored to patients' unique clinical characteristics and needs, Simply Rehab therapists commonly churned their Medicare beneficiaries through rote exercises that provided little clinical benefit and served only to inflate the number of minutes Simply and the SNF could report on the Minimum Data Set and bill to Medicare.

95.     Simply Rehab therapists provided, and the SNFs billed for, therapy that sometimes jeopardized the health of Medicare patients who were imminently terminal, fatigued, sick, or otherwise medically unstable.

96.     Simply Rehab therapist improperly placed patients into group therapy that was not related to their plans of care or that included activities in which the patient could not be reasonably expected to participate as a way to inflate their therapy minutes. Group therapy is where a single therapist conducts the same therapy exercises with two to four beneficiaries at the same time.

97.     The SNFs also regularly billed for unreasonable and unnecessary therapy that

was provided to Medicare beneficiaries in disciplines that the beneficiaries did not require.

98.     To meet the required number of minutes to bill Medicare at the Ultra High level, Simply Rehab therapist often improperly included time on the Minimum Data Set that its therapists spent providing routine or custodial services that did not require the skills of a rehabilitation therapist and that should have been performed by non-skilled personnel.  For example, Simply Rehab therapists regularly billed time that the beneficiaries spent working on repetitive exercises that, under the circumstances, did not require skilled care, such as the stationary bike, or time that the therapists spent simply transferring, dressing, toileting, feeding, and bathing beneficiaries rather than training the beneficiaries to perform the activities or exercises themselves.

99.     The SNF's knew that Medicare only paid for skilled rehabilitative therapy services that were reasonable and necessary, consistent with the nature and severity of the patient's illness or injury, the patient's particular medical needs, and accepted standards of medical practices.

100.    The SNF's also knew, since at least September 2005, that the provision of medically unnecessary rehabilitation therapy was an area of concern identified by the HHS Office of Inspector General ("HHS-OIG").

101.    In September 2005, the HHS-OIG published supplemental guidance to skilled nursing facilities that identified therapy services and in particular the "improper utilization of therapy services to inflate the severity of RUG classifications and obtain additional reimbursement" as a fraud and abuse risk area. OIG Supplemental Compliance Program Guidance for Nursing Homes, 73 Fed. Reg. 56832, 56840 (Sept. 30, 2008).

102.    HHS-OIG "strongly advise[d] nursing facilities to develop policies, procedures,

and measures to ensure that residents are receiving medically appropriate therapy services." *Id.*

103.     As a result of Simply Rehab and the SNFs' constant push for billable minutes, its therapists regularly provided services that were medically unreasonable, unnecessary, and unskilled for a variety of non-exclusive, overlapping reasons. As illustrated by the examples below, Simply Rehab therapists subjected many Medicare beneficiaries to Ultra High levels of therapy when their clinical characteristics and physical condition indicated that they could not be reasonably expected to participate in, much less benefit from, those levels of intensive therapy.

104.     For example, recipient, Patient Z,[3] was hospitalized on April 26, 2007 until May 2, 2007 with a diagnosis of chest pain.  After her hospitalization, Patient Z was referred by the hospital and admitted to Arlington for physical and occupation therapy.  Patient Z's prior level of functionality did not require any therapy services.  Her RUG category was Ultra High and Arlington billed Medicare for 29 days at $459.85 per day totaling $13,335.65.

105.     Another example was Patient Y, a long-term resident of Arlington admitted for skilled nursing care on referral from a local hospital.  He was admitted due to an abscess that required daily dressing changes and antibiotics.   Patient Y was 49 years old and wheel chair bound utilizing a power chair for more than 2 years prior to his re-admission to Arlington on June 19, 2007.  On at least two separate occasions, Patient Y was hospitalized for his abscess and returned to Arlington.  Patient Y was provided both physical and occupational therapy by a Simply Rehab therapist under the immediate direction of Rehab Manager, Dennis Candelera. Patient Y's prior level of functionality did not require any therapy services.  Patient Y's resulting RUG category was Ultra High and Medicare was billed at $459.85, the corresponding daily rate, for 100 days.

---

[3] Patient names have not been included in this Second Amended Complaint in order to protect patient privacy. Defendants have been served via email a copy of this Second Amended Complaint.

106. Patient X was a Medicare recipient admitted to Arlington from a local hospital on March 20, 2007. Mr. Kunio and Mr. Olen, Simply Rehab's Rehab Manager assigned to Arlington, knowingly, fraudulently and in violation of the Medicare and Medicaid regulations, permitted the numerous re-evaluations of Patient X to create a higher Medicare reimbursement for the SNF by keeping her in the SNF for the full 100 days of her Medicare coverage. Dolan observed that Patient X was very ill and had many medical issues that prevented her from participating fully in a therapy program. Prior to admission, Patient X was already dependent and bed-bound. There was no reasonable expectation for improvement in the patient's condition. So many physical and occupational therapy minutes were allegedly provided to her that she was in the Ultra High RUG category. Medicare was billed accordingly at $459.85, the corresponding daily rate.

107. Patient W was a Medicare recipient readmitted to Arlington on March 12, 2007. She was provided physical and occupational therapy resulting in a Very High RUG categorization. Again, Simply Rehab therapists provided the therapy under the direction of Mr. Candelera because there were generally required to provide therapy for every admitted resident. Pre-admission, Patient W was already dependent in all care needs. Dolan reviewed her chart while she was at Arlington including the MDS and notes. No change in her functionality were documented. Medicare was billed at $383.17, the daily rate corresponding to her RUG categorization.

108. Patient V, 97 years old, was readmitted to Arlington on April 21, 2007 into the Dementia Unit for skilled nursing care despite the recommendation for hospice care. The Simply Rehab therapists developed and recorded a care plan for Patient V that included speech, occupational, and physical therapy resulting in a Very High RUG categorization. In reality, he

28

was totally dependent and required 24 hour care. As a result, Patient V was unable to benefit from therapy at all. Medicare was billed at $383.17, the daily rate corresponding to her RUG categorization.

109. Patient U, 78 years old, was admitted to Arlington on May 3, 2007 from a local hospital. He had end-stage dementia and was totally dependent for all care needs. Simply Rehab therapists provided physical and speech therapy resulting in a RUG categorization of Ultra High. In May 2007, Arlington billed Medicare for 28 days at $459.85 ($8,737.15 for the month).

110. Patient T, 79 years old, was admitted to Arlington on March 2, 2007 after hospitalization for a bladder infection. Patient T had end-stage dementia and had already been a resident at Arlington. At the time of readmission Patient T was able to ambulate with a walker just as she had been able to prior to discharge. Arlington billed Medicare for all 20 days of Medicare A coverage available during the month of March 2007 at a rate of $394.51 per day and for total reimbursement of $7,890.20, which was paid during the month of April 2007.

111. Patient S was referred to Aurora by Dr. Patel and admitted on March 8, 2008. She received both physical and occupational therapy. Patient S's previous level of function did not change from prior to hospitalization. Ms. Arado directed Aurora staff to cover the patient under Medicare Part A. Aurora billed for daily reimbursement, $388.21, from March 8, 2008 through March 31, 2008 totaling $8,928.83 billed in April 2008.

112. The following Broomfield patients were referred from local hospitals and all received physical and occupational therapy per Simply Rehab staff:

| Patient | Month | RUG | Amount Billed to Medicare | Reason Therapy Was Unnecessary |
|---------|-------|-----|---------------------------|--------------------------------|
| Patient K | | | $8,426.71 | This patient's primary diagnosis was Diabetes and no diagnosis related to neurological issues was listed |

| | | | | on UB-92. |
|---|---|---|---|---|
| Patient J | October 2004 | RUB | $10,654.43 | No supporting documentation or diagnosis related to amount of therapy provided. |
| Patient I | October 2005 | RVB | $7,955.87 | No supporting diagnosis related to speech. |
| Patient H | September 2007 | RUB | $8,677.90 | Patient was diagnosed with failure to thrive. |
| Patient G | September 2007 | RUX | $2,323.16 | This patient has CHF depression and vision problems. The therapy provided this patient was unable to be tolerated relate to her diagnoses. |

113.    Another illustration of how the focus on increased Medicare revenues changes the SNFs: in 2003, Carver's average RUG reimbursement was $301.76 per day per patient. With implementation of Simply Rehab's therapy scheme over a 4 year period, Carver raised the average RUG dollar amount to $349.70. Dolan witnessed no change in the demographics and nature of patients being served over the 4 year period. During the month of May 2007, Carver had billed Medicare for $368,228.80 with 46% of the patients categorized as Ultra High and Very High.

114.    During Dolan's May 10, 2007 visit to St. George, he reviewed therapy patients currently on case load. At that time, Dolan learned that Mr. Kunio was directing the Rehab Manager to place all patients in Ultra High therapy. Additionally Mr. Kunio directed the Rehab Manager to have a case load of at least 25% Medicare Part B patients. In 2004, St. George averaged 5% of the patients receiving Ultra High. In 2007, the Ultra High average had increased to about 40%.

## VII.    DUAL MEDICARE & MEDICAID ELIGIBILITY

115.    As discussed above, the MDS is a standardized, primary screening and assessment tool of health care status which forms the foundation of the comprehensive

assessment for all residents of long-term care facilities certified to participate in Medicare and/or Medicaid. Medicare and Medicaid require that all residents of long-term care facilities, certified to participate, collect MDS on all residents upon admission as well as every three (3) months or ninety (90) days. Re-assessment of residents shall be done at the request of a physician. Individuals who are entitled to Medicare Part A and/or Part B and some form of Medicaid are characterized as "dual eligible." For dual eligible individuals, the Medicaid programs supplement Medicare coverage by providing services and supplies that are available under their states' Medicaid programs.

116. Ashley Smithey, Administrator of Willow Ridge, controlled the day-to-day operations of that SNF. Per her request, Simply Rehab provided licensed and unlicensed physical therapists to the SNF.

117. Ms. Smithey directed Simply Rehab therapists to re-assess residents in coordination with the MDS requirements of every three (3) months or ninety (90) days. Simply Rehab therapists were directed to assess residents with an upcoming MDS reference period with the directive to cover the patient under Part B services prior to the reference period. Medicare was billed for Part B therapy which was unnecessary and useless. Ms. Smithey targeted patients that were dual eligible every three (3) months or ninety (90) days for the purpose of prescribing physical and occupation therapy, when the therapists knew or should have known that the patients functional capacity would not or could not improve with physical and/or occupation therapy. Despite this knowledge, Ms. Smithey and Simply Rehab knowingly and fraudulently performed medically unnecessary services for dual eligible patients and subsequently submitted false claims to both Medicare and Medicaid. Dolan reviewed relevant patient charts and the documentation revealed no decline in the patients' ADLs. Willow Ridge billed for these services

on a monthly basis beginning in 2006 with the implementation of North Carolina's case mix payment system.

118.    The purpose of this scheme was for the SNFs to unlawfully enrich themselves through the submission of false and fraudulent Medicare and Medicaid claims for medically unnecessary physical and occupational therapy for dual eligible patients.

## VIII.   SUBMISSION OF FALSE CLAIMS, COST REPORTS, AND OTHER INACCURATE INFORMATION TO MEDICARE

119.    SNFs are required to annually submit a Cost Report and Compliance Certificate, 42 USC § 413.20(b).  This Cost Report is used by both Medicare and Medicaid.  Every Cost Report contains a Certificate of Compliance which must be signed by the chief administrator of the provider, a responsible designee of the administrator or medical director.

120.    The Cost Report specifically contains the following:

Misrepresentation or falsification of any information contained in this Cost Report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under Federal Law. Furthermore, if services identified in the Report were provided or procured through the payment directly or indirectly of a kickback or were otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

CERTIFICATION BY OFFICER OR ADMINISTRATOR OR PROVIDER(S) I HEREBY CERTIFY that I have read the above statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet and Statement of Revenue and Expenses prepared by . . . (Provider Name(s) and Number(s)) for the cost reporting period beginning . . . and ending . . . and that to the best of my knowledge and belief it is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of health care services and that the services identified in this cost report were provided in compliance with such laws and regulations.  (emphases added)

121.    In each Cost Report, the SNF administrator or responsible designee of the administrator must certify that he or she is: "familiar with the laws and regulations regarding the provisions of health care services and that the services identified in the Cost Report were

provided in compliance with such laws and regulations."

122.     The SNFs knowingly, fraudulently and in violation of Medicare regulations, submitted false claims to Medicare for the years 2000 through at least when Dolan was terminated, with supporting documents and certifications in order to obtain payments from Medicare knowing that those documents included false representations.

123.     The cost reports for the years 2000 up to the present each include a certification falsely representing that the SNFs and hospital provided services in compliance with pertinent laws and regulations when in fact, defendants knew that they had violated various laws and regulation, including those pertaining to kickbacks, providing medically necessary services, and the waiver of co-payments and deductibles.

124.     From about year 2000 through at least when Relator Dolan was terminated, the SNFs knowingly, fraudulently and in violation of Medicare regulations, submitted fraudulent claims to Medicare that caused Medicare to grossly and inaccurately overpay the SNFs.  The SNFs submitted and caused these claims to be submitted with actual knowledge that the claims were false or in deliberate ignorance and reckless disregard that such claims were false and fraudulent.

125.     Simply Rehab and the SNFs through their agents, servants and employees, directly and indirectly, instructed and caused others to instruct personnel to falsify patient and administrative records to advance and conceal the fraud scheme.

126.     The SNFs' Cost Reports from 2000 until the present included services where physicians received illegal inducements and illegal upward coding prohibited by 42 U.S.C. § 1320a-7b(a) and 42 U.S.C. § 1320a - 7b(b), thereby rendering the Cost Report a false record or statement.

127.     The SNFs' Cost Reports from 2000 until the present included services to patients by physicians who had prohibited financial relationship between the SNFs' and the referring physician prohibited by 42 U.S.C. § 1395nn, thereby rendering the Cost Report a false record or statement.

128.     The SNFs' Cost Reports from 2000 until the time at which Relator Dolan was terminated, included medically unnecessary services to patients by therapists or others who were unauthorized to render services, or such services were inappropriate due to their medically unnecessary nature, prohibited by 42 U.S.C. § 1395y, thereby rendering the Cost Report a false record or statement.

129.     The fraudulent Cost Reports and false certifications submitted by the SNFs from 2000 forward were material to the government's decision to pay the interim and final claims submitted by the SNFs under the Medicare and Medicaid programs in the subject years.  If the government had known that the Cost Reports and certifications were false, it would not have paid the claims of the SNFs.

## IX.     THE STARK LAW & ANTI-KICK BACK STATUTE

130.     Congress enacted the original Stark Law ("Stark I"), applicable only to clinical laboratory services, on December 19, 1989.  Pub. L. No. 101-239, § 6204 (Dec. 19, 1989).  On August 10, 1993, Congress made the Stark Law applicable to ten additional designated health services ("Stark II").  Pub. L. No. 103-66, § 13562(a) (Aug. 10, 1993).  Congress intended these statutory provisions to prevent "self-referrals," or referrals by physicians to those with whom they have too close a relationship.  The Stark Law, 42 U.S.C. §1395nn (approved 11/11/2009), further developed limitations on certain physician referrals, providing that if a physician (or an immediate family member of such physician) has a financial relationship with a specified entity 1) the physician may not make a referral to the entity for the furnishings of designated health

34

services for which payment otherwise may be made, and 2) the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a prohibited referral.

131.     The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) ("AKS"), bars vendors from offering or paying any remuneration, including "kickbacks, bribes and rebates" to induce the purchase of goods by healthcare providers receiving funds from government programs, including Medicare and Medicaid ("Providers").  A major problem with kickbacks, in addition to their improper influence over a Provider's purchasing decision, is that they are often not properly treated as setoffs to costs reported to the government.  *See* Comments to 42 C.F.R. 1001.952 (giving federal programs "less than their proportional share" of payments is "seriously abusive.") Provider submissions for reimbursement from government-funded health programs which are tainted by kickbacks are false claims in violation of the FCA.

## X.     SELF-REFERRAL & BONUSES FOR INCREASED SNF MEDICARE REVENUE

### A.  THE SNFs COMPENSATED DR. RYABOV, DR. TACK AND DR. PATEL FOR MEDICARE REFERRALS

132.     Dolan observed Ms. Arado, solicit Dr. Ryabov in or about 2005, Dr. Tack in 2006, and Dr. Patel in or about 2007, to come to the SNFs by agreeing to make these doctors medical directors or assign similar positions and pay in exchange for referral relationships.  The doctors were given remuneration for patient referrals because as medical directors they were each paid a flat monthly fee to be medical directors on the contingent basis that they continued to refer patients to their facility in violation of STARK.

133.     In 2006, Ms. Arado engaged Dr. Tack, Illinois Bone and Joint Institute ("IBJI") Practice Manager, at their corporate offices in Hoffman Estates with an offer to allow an IBJI physician to become Medical Director in exchange for patient referrals.  Dolan was present

during the initial discussion. Dr. Tack agreed to accept the Medical Director position at Arlington in exchange for orthopedic patient referrals to Arlington. Dolan reviewed the contract draft and the contract was approved by Mr. Finn, Mr. Mann, and Greg Seeger, Administrator at Arlington. Before the execution of this agreement, IBJI had been sending joint replacement patients to several skilled nursing homes post-operatively for physical and occupational therapy. In addition to Arlington's expectation that Dr. Tack refer IBJI patients, Arlington also paid Dr. Tack $2,000 per month. Ms. Arado marketed Dr. Tack as an Orthopedic Consultant for the SNF, but Dr. Tack was still paid as a Medical Director based on the expense account and filed Cost Reports.

134.    Dr. Tack made it clear that he was not interested in performing the duties typically associated with the position of Medical Director and that he would only see IBJI patients at Arlington. For his convenience, all IBJI patients were housed in the "300 unit" in private rooms and Ms. Debbie McGann, RN was designated to do rounds with Dr. Tack when he visited to review his patients' statuses.

135.    Dr. Tack made this agreement with Arlington in violation of the self-referral statute (e.g., receiving monies for patient referrals). Arlington only had exclusions admissions from IBJI once the contract with Dr. Tack was in place.

136.    Dr. Tack referred the following patients who received Medicare Part A services which were billed as per batch method by the billing department at Arlington by the 5th of the following month. Documents related to specific billings were kept secured with the billing staff, Mr. Finn and Mr. Mann:

137.    Patient R was at the Arlington on March 25, 2007 through at least March 31, 2007 and received Medicare Part A services for that month. At the time of Dolan's observation,

Patient R was receiving Very High therapy services. Medicare was billed approximately $394.51 per day, $2,761.57 total in April 2007.

138.    Patient Q was also at Arlington on April 26, 2007 through at least April 30, 2007 and received Medicare Part A services for that month. At the time of Dolan's observation, Patient Q was receiving Ultra High therapy services. Medicare was billed approximately $394.51 per day, $1,972.55 total in May 2007.

139.    Patient P was at the Arlington on March 25, 2007 into April 2007 and 10 days prior received Part A services for the month of March 2007. At the time of Dolan's observation, Patient P was receiving Ultra High therapy services. Medicare was billed approximately $473.46 per day, $3,314.22 total in April 2007.

140.    Patient O was at the Arlington on April 28, 2007 through at least April 30, 2007 and 10 days prior received Part A services for the month of April 2007. At the time of Dolan's observation, Patient O was receiving Ultra High therapy services. Medicare was billed approximately $473.46 per day, $1,420.38 total in May 2007.

141.    Patient N was at the Arlington on May 8, 2007 through at least May 31, 2007 and 23 days prior received Part A services for the month of May 2007. At the time of Dolan's observation, Patient N was receiving Ultra High therapy services. Medicare was billed approximately $473.46 per day, $11,363.04 total in June 2007.

### B.  THE SNFs GAVE STAFF BONUSES FOR INCREASING MEDICARE REVENUES

142.    Under the SNFs' corporate compensation structure, monetary bonuses were paid based on facility censuses, the mix of Medicare and Medicaid patients at each facility. In exchange for increased Medicare patient populations, the SNFs paid bonuses to Ms. Arado, for example. The greater the Medicare and Medicaid patient populations—increasing the rate of

reimbursement for the facility in Government dollars—the larger the corresponding bonuses paid to her. Due to Ms. Arado's ownership interest in more than one of the SNFs and the bonus structure, she was compensated by every facility.

143. To increase Medicare and Medicaid population within each SNF, the SNFs utilized the referral relationships that Ms. Arado cultivated. For example, Dr. Ryabov had hospital privileges at Advocate Condell Medical Center and would refer new patients that he believed may justify Medicare coverage for skilled nursing care to the SNFs.

## XI. FOX VALLEY PROVIDED PODIATRISTS TO PROVIDE WOUND CARE ABOVE THE ANKLE

144. Under Medicare and Medicaid programs, providers may only submit claims for services that are "of a quality which meets professionally recognized standard of care." 42 U.S.C. § 1320-5(a)(2).

145. Fox Valley's podiatrists, including John Lamiot, DPM, and Peter Tsang, DPM, are credentialed to practice on the ankle and below pursuant to the Podiatric Medical Practice Act of 1987 (225 ILCS 100). On or about the year 2005, Aurora had cultivated a relationship with Fox Valley to provide wound care services at its facility.

146. Relator Dolan routinely witnessed and observed both Dr. Lamiot and Dr. Tsang provide wound care services to recipients at Aurora outside the scope of their licensure by providing care and treatment above patients' ankles.

147. Defendants billed Medicare and Medicaid for each episode of out of scope treatment (above the ankle) in addition to wound care, scraping and debridement that were also medically unnecessary.

148. For example, Patient M, a patient being treated at Aurora was treated for a sacral (at the base of the tailbone) wound for over a year, usually on a weekly basis, and those services

were fraudulently billed to Medicare and Medicaid even though they were inappropriately provided by Dr. Lamiot and Dr. Tsang.  Her wound was debrided with a scalpel while patient was in her bed.  Each time the patient had this treatment Medicare was billed $434 per week by Dr. Lamiot and Dr.Tsang for more than 12 months. The patient suffered repeated pain and suffering and by CMS definition would be considered elder abuse.

149.    Patient L's above the ankle wounds were treated by Dr. Lamiot at Fox Valley on the following dates and the following claims were submitted to Medicare:

05/19/2009 11042-LT51(2), 11042-59LT51(1), 93922(1) for $1502.00 Medicare paid $222.70
05/26/2009 11042-LT51(4), 11042-59LT51(3), 93922(1)  for $3238.00 Medicare paid $340.43
06/02/2009 11042-LT51(3), 11042-59LT51(2), 93922(1)  for $2370.00 Medicare paid $281.56

Her above the ankle wounds were also treated by Dr. Tsang and Medicare was billed:

07/06/2009 99253(1) and billed Medicare for 300.00 and paid 55.61
07/07/2009 99232(1) and billed Medicare for 152.00 and paid 55.61
07/08/2009 99232(1) and billed Medicare for 152.00 and paid 55.61

150.    Similarly, Dr. Lamiot and Dr. Tsang knowingly, fraudulently and in violation of Medicare and Medicaid regulations performed medically unnecessary procedures on approximately thirty (30) recipients per month at Aurora and signed off on medical prescriptions for other areas of the body above the ankle in violation of the Illinois Practice Act.

151.    Furthermore, Dolan observed Fox Valley commit these violations at other facilities not named or mentioned in this lawsuit, while billing Medicare and Medicaid.

152.    As outlined above, Fox Valley repeatedly violated Medicare and Medicaid rules and regulations leading to the continued payment and/or overpayment for treatments that were unnecessary.  All of the allegations contained herein were witnessed by Dolan.

153.    Additional facts supporting the allegations contained herein are within the SNFs' and Simply Rehab's exclusive knowledge and control.  Relator Dolan is no longer employed by

the SNFs and lacks access thereto. Fox Valley's fraudulent behavior is long running, widespread, and ongoing.

## XII.   THE SNFs SOUGHT OUT PHARMACEUTICAL CONTRACTS IN VIOLATION OF MEDICARE'S RULES AND REGULATIONS

154.   Rx Pharmacy, now owned by Pharm America, is a wholesale pharmacy that sells medications and pharmaceuticals to health care facilities, acute health care facilities, skilled nursing facilities and other entities.

155.   Omnicare is a wholesale pharmacy that sells medications and pharmaceuticals to health care facilities, acute health care facilities, skilled nursing facilities and other entities.

156.   Prior to Relator Dolan's discharge, Paul Colliti was an agent or employee of Rx Pharmacy, now owned by Pharm America ("Rx Pharmacy").

157.   Prior to Relator Dolan's discharge, Rx Pharmacy held contracts with the SNFs. James Mann, as agent and employee of Arlington knowingly and fraudulently attempted to contract with Paul Colliti of Rx Pharmacy for below Medicare required average wholesale price ("AWP").

158.   AWP is a prescription drugs term referring to the average price at which wholesalers sell drugs to physicians, pharmacies and other customers.

159.   James Mann directed Relator Dolan to negotiate below the AWP with other pharmaceutical providers.

160.   James Mann and Aaron Mann knew or should have known that negotiating with pharmaceutical providers for below AWP was not Medicare compliant and would result in the overpayment of Medicare reimbursements.  This information and the Anti-Kickback Statute were covered during annual compliance training.

161.   After Relator Dolan's discharge, the contracts between Rx Pharmacy and Aurora

and Arlington were cancelled.

162.    James Mann also negotiated deeply discounted daily rates for medications from Omnicare for the SNFs' Medicare Part A patients.  In exchange, the SNFs gave all of their Medicare Part D prescription business to Omnicare.  This "swap" violated the Anti-Kickback Statute.

163.    After Relator Dolan's discharge, James Mann and Aaron Mann, on behalf of Defendants, Aurora and Arlington, successfully finalized contracts with Omnicare.

164.    On information and belief, the contracts between Omnicare and Arlington, and Omnicare and Aurora are ongoing.

## XIII.    THE SNFs TERMINATED DOLAN FOR HIS EFFORTS TO STOP THE FRAUD OCCURING AT THE FACILITIES

165.    Patrick Finn was Dolan's direct supervisor and Dolan communicated with him 2-3 times per week as well as a weekly review of Dolan's activities with the 8 SNFs.  A majority of communication was by email per Mr. Finn's preference.

166.    In January 2007, after Aaron Mann returned from Carver and he was appointed Administrator of Arlington, Dolan witnessed a great increase in the fraudulent activities at the SNF as Aaron Mann and Ms. Arado tried to increase Medicare census for the facility.  On at least three occasions, Dolan discussed orally with Mr. Finn the fraud that Mr. Mann and Ms. Arado were involved with on a daily basis. Dolan also emailed Mr. Finn to follow up to see if he had discussed the observations with Mr. Mann and when the fraudulent activities would stop.

167.    Mr. Finn told Dolan that he agreed that the behaviors of Mr. Mann and Ms. Arado were unacceptable and needed to change.  These communications continued to occur through May 2007.

168.    At that point, Dolan told Mr. Finn that if Mr. Finn did not stop the behaviors

motivated by increasing Medicare revenues that Dolan would call the hot-line for Medicare fraud in Chicago.

169.     Mr. Finn again stated that he would discuss the issues Dolan raised with Mr. Mann and Ms. Arado.  In May 2007, the corporate staff held an in-service related to fraud prevention in order to ensure education related to the fraudulent behaviors.

180.     Mr. Finn also agreed to an educational program for the Western division SNFs which was set up by Dolan and scheduled for the first part of August 2007.

181.     Dolan continued to discuss the SNFs' ongoing fraud with Mr. Finn through mid-July 2007.  At that time, Dolan still had what he believed to be a positive relationship with Mr. Finn because Mr. Finn relied heavily on Dolan to direct the SNFs.

182.     When Dolan returned from vacation on Friday, July 27, 2007, James Mann requested that Dolan meet with him and Mr. Finn the following Monday.  Dolan reminded Mr. Mann that he would be in Utah getting ready for the education program for the Western division SNFs.  Mr. Mann directed Dolan to cancel the education program.

183.     On Monday, July 30, 2007, Dolan met with Mr. Mann and Mr. Finn at Arlington at which point James Mann terminated Dolan and offered a severance agreement that attempted to preclude Dolan from reporting any of the SNFs' activities to outside agencies, including Medicare and Medicaid.

<u>**COMPLAINT COUNTS**</u>

**I.     COUNT I - FALSE CLAIMS ACT**

184.     Relator Dolan realleges and incorporates by reference the allegations previously alleged herein.

185.     This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729 (a)(1).

42

186.     As a result of the misconduct alleged herein, Defendants knowingly presented or caused to be presented to the United States false or fraudulent claims for payment.

187.     The United States, unaware of the false or fraudulent nature of these claims, paid such claims when they would not otherwise have been paid.

188.     By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

## II.     COUNT II - UNJUST ENRICHMENT, DISGORGEMENT, AND PAYMENT BY MISTAKE

189.     Relator Dolan realleges and incorporates by reference the allegations previously alleged herein.

190.     By virtue of submitting claims to Medicare for medically unreasonable, unnecessary, and unskilled services, the defendant obtained inflated payments from the United States. Thus, the defendant was unjustly enriched at the expense of the United States, in such amounts, as determined at trial.

191.     The SNFs submitted claims for Ultra High rehabilitation therapy to Medicare when that level of care was not medically unnecessary. The United States paid more money to The SNF's than it would have had the defendant not submitted claims for medically unreasonable and unnecessary rehabilitation therapy.

## III.     COUNT III - THE STARK LAW AND ANTI-KICKBACK PROVISIONS

192.     Relator Dolan realleges and incorporates by reference the allegations previously alleged herein.

193.     The Medicare anti-kickback statute and Stark II legislation make it illegal to offer, pay, solicit or receive anything of value as an inducement to generate business payable by Medicare...'' 42 U.S.C. §1329-7b(b). See also 42 U.S.C. §1395nn(h)(6). Stark II expressly

requires that the entity collecting payments for services performed under a prohibited referral must timely refund all collected payments. 42 CFR §411.353.

194.     By virtue of the above acts, and by offering physician incentives based on revenue generated, Defendants have violated the anti-kickback statute and Stark II.

195.     By reason of these violations, the United States has been damaged, and continues to be damaged, in a substantial amount.

## IV.     COUNT IV - ILLINOIS WHISTLEBLOWER REWARD AND PROTECTION ACT

196.     Relator Dolan realleges and incorporates by reference the allegations previously alleged herein.

197.     This is a claim for treble damages and civil penalties under the Illinois Whistleblower Reward and Protection Act.  740 ILCS. § 175/1, *et seq*.

198.     As a result of the misconduct alleged herein, Defendants knowingly caused to be presented to the State of Illinois false or fraudulent claims for payment.

199.     The State of Illinois, unaware of the false or fraudulent nature of these claims, paid such claims when they would not otherwise have paid.

200.     By reason of these payments, the State of Illinois has been damaged, and continues to be damaged, in a substantial amount.

## V.     COUNT V - UNLAWFUL RETALIATION IN VIOLATION OF SECTION 3730(h) OF THE FALSE CLAIMS ACT

201.     Relator Dolan repeats and realleges each allegation previously alleged herein.

202.     31 U.S.C. §  3730(h) provides as follows:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this Section, including investigation for, initiation of,

> testimony for, or assistance in an action filed or to be filed under this Section, shall be entitled to all relief necessary to make the employee whole.  Such relief shall include reinstatement with the seniority status such employee would have had but for the discrimination, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. Any employee may bring an action in the appropriate district court for the United States for the relief provided in this subsection.

203.    Relator Dolan's actions in advising the management of Defendant SNF, Arlington, and other Defendants of their wrong doings and repeated failure to provide true and accurate care to its residents constitute protected activities in furtherance of a Qui Tam action, as defined in Section 3730(h) of the False Claims Act.

204.    Defendants retaliated against Relator Dolan as a direct result of his protected activities.  The retaliation included but was not limited failure and refusal to cease their fraudulent practices and termination of his employment.

205.    Defendants' fraudulent acts as described herein constitute violations of 31 U.S.C. § 3729 et. seq.  Relator Dolan's efforts to disclose and correct Defendants' violations of the False Claims Act as described herein, were made in furtherance of protected activities under s 3730(h) of the False Claims Act.

206.    Defendants knew or should have known that Relator Dolan was engaging in such protected activities when he revealed the Defendants' failure of care to the SNFs' management and other Defendants.

## VI.    COUNT VI - UNLAWFUL RETALIATION IN VIOLATION OF THE ILLINOIS WHISTLEBLOWER REWARD AND PROTECTION ACT

207.    Relator Dolan repeats and realleges each allegation previously alleged herein.

208.    740 ILCS 175/4 (g) provides, in relevant part, as follows:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and

conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this Section, including investigation for, initiation or, testimony for, or assistance in an action filed or to be filed under this Section, shall be entitled to all relief necessary to make the employee whole. Such relief shall include reinstatement with the seniority status such employee would have had but for the discrimination, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

209.    Relator Dolan's actions in advising Defendant, Simply Rehab's, management and others of Defendants' repeated failure to provide true and accurate care to its residents constitute protected activities as defined in 175/4 (g) of the Illinois Whistleblower Reward and Protection Act ("IWRPA").

210.    Defendants retaliated against Relator Dolan as a direct result of his protected activities. The retaliation included but was not limited to failure and refusal to cease their fraudulent practices and termination of his employment.

211.    Defendants' fraudulent acts as described herein constitute violations of the IWRPA, 740 ILCS 175/3 et. seq. Relator Dolan's efforts to disclose and correct Defendants' violations of the IWRPA, as described herein, were made in furtherance of protected activities under section 175/4 (g) of the IWRPA.

212.    Defendants knew or should have known that Relator was engaging in such protected activities when he revealed the Defendants' failure of care and compliance with state and federal law to the SNFs' and Simply Rehab management.

## PRAYER FOR RELIEF

WHEREFORE, Relator Dolan requests that judgment be entered against the Defendants, ordering that:

A.    The Defendants cease and desist from violating the False Claims Act, 31 U.S.C.

46

§ 3729, et seq., the Medicare anti-kickback statute and Stark II legislation, 42 U.S.C. §1329-7b(b), and the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/1, *et seq*;

B.      The Defendants pay not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729, plus three times the amount of damages the United States has sustained because of Defendants' actions, plus the appropriate amount for violation of 42 U.S.C. §1329-7b(b), plus the appropriate amount to the State of Illinois for each violation of 740 ILCS 175/3;

C.      Relator Dolan be awarded the maximum "relator's share" allowed pursuant to 31 U.S.C. § 3730(d) and 740 ILCS 175/4(d);

D.      Relator Dolan be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d) and 740 ILCS 175/4(d);

E.      The Defendants be enjoined from concealing, removing, encumbering, or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court;

F.       The Defendants disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

G.      Awarding Realtor Dolan front pay and two times his back pay since July 30, 2007, plus interest on his back pay calculated at the prime rate, compounded annually;

H.      Awarding Relator Dolan compensatory damages;

I.      Awarding Relator Dolan punitive damages in an amount sufficient to deter Defendants from committing such wrongful acts in the future; and

J.      The United States, the State of Illinois, and Relator Raymond Dolan recover such other relief as this Court deems just and equitable.

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator Dolan hereby demands a trial by jury.

DATED: September 22, 2014          Respectfully Submitted By:

                                  s/ David A. Bryant
                                  BRYANT LEGAL GROUP PC
205 North Michigan Avenue Suite 3910      David A. Bryant
Chicago, IL 60601                 dabryant@bryantlg.com
(312) 561-3010                    Jennifer Danish
Facsimile (312) 254-3140          jdanish@bryantlg.com


                                  CLIFFORD LAW OFFICES P.C.
120 North LaSalle Street Suite 3100      Robert A. Clifford
Chicago, Illinois 60602           rac@cliffordlaw.com
(312) 899-9090                    Thomas K. Prindable
Facsimile (312) 251-1160          tkp@cliffordlaw.com
                                  Shannon McNulty
                                  smm@cliffordlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on September 22, 2014 I electronically filed the foregoing with the Clerk of the Court using the ECF system that will send notification of such filing to the attorneys who filed appearances in the case.

                                  s/ David A. Bryant
                                  David A. Bryant

David A. Bryant
Jennifer M. Danish
Bryant Legal Group PC
205 N Michigan Ave, Ste 3910
Chicago, IL 60601
(312) 561-3010
Facsimile (312) 254-3140