IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| United States of America, State of Illinois, State of North Carolina<br><br>Ex rel. Raymond Dolan,<br><br>Plaintiff,<br><br>v.<br><br>Long Grove Manor, Inc. d/b/a Arlington Rehabilitation & Living Center, et al.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>No. 10 C 368<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

<u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff-Relator Raymond Dolan ("Dolan") brings this *qui tam* action on behalf of the United States and the State of Illinois alleging Medicare fraud on the part of defendants Simply Rehab, LLC ("Simply Rehab"); Long Grove Manor, Inc. d/b/a Arlington Rehabilitation & Living Center ("Arlington"); Aurora Manor, Inc. d/b/a Aurora Rehabilitation & Living Center ("Aurora"); and Broomfield Skilled Nursing & Rehabilitation Center LLC ("Broomfield"). Before me is the defendants' motion for summary judgment.[1] For the reasons explained below, the motion is granted.

---

[1] I refer to Arlington, Aurora, and Broomfield collectively as the "skilled nursing facility defendants" or the "SNF defendants." I refer to Simply Rehab and the SNF defendants collectively as "defendants."

I.

Simply Rehab employs licensed therapists who provide skilled nursing and rehabilitation care (i.e., physical, occupational, and speech therapy) to patients in skilled nursing facilities ("SNFs"). In addition to other SNFs throughout the country, Simply Rehab supplied therapists to supervise, organize, and administer skilled nursing and therapy programs at the Arlington, Aurora, and Broomfield facilities.

Insurance for skilled nursing and rehabilitation services is covered by Part A of the Medicare program. To qualify for coverage, the services must be medically necessary. *See* 42 U.S.C. § 1395y(1)(A) (providing that no payment may be made under [Medicare Part A] for any expenses incurred for items or services . . . [that] are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member"). The daily rate Medicare pays providers for these services depends on the level of care a patient requires. SNFs are required to assess patients' medical needs periodically and to assign them to one of several Resource Utilization Groups ("RUGs") based on the type and amount of therapy they need. Generally speaking, the higher the RUG level, the greater the daily rate an SNF receives for the skilled nursing care it provides to a patient.

Dolan was hired as a Corporate Nurse for the Arlington and Aurora SNFs in April 2003. He alleges that, beginning in 2000, the defendants participated in a scheme to improperly assign patients to the highest RUG category – the "Ultra High" Level – and to provide them with therapeutic services regardless of the patients' medical needs, solely to maximize their profits. According to Dolan, defendants engaged in this so-called "upcoding" by setting "aggressive targets" for the number of days that Medicare would

be billed for care at the Ultra High Level. 2d Am. Compl. ¶ 59. He alleges that defendants pressured therapists to meet these targets through "corporate meetings and presentations, through regular emails and facility visits by corporate personnel, through employee performance evaluations, by imposing action plans on underperforming facilities, and various other means." *Id*. ¶ 4. In short, Dolan claims that defendants committed fraud by submitting claims to Medicare seeking payment for skilled nursing services they knew were not medically necessary.

The scheme as originally outlined by Dolan involved more than twenty-five defendants. These included a total of twelve SNFs (including Arlington, Aurora, and Broomfield), six "supportive living centers," as well as several individuals. The scheme also allegedly involved several forms of wrongdoing in addition to upcoding, including kickbacks for physician referrals and prescription discounts. Dolan's complaint asserted a claim under the False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1); the Illinois Whistleblower Reward and Protection Act ("IWRPA"), 740 ILCS 175/1, *et seq*.;[2] the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b); and the Stark Law, 42 U.S.C. § 1395nn. Dolan also brought common law equitable claims for unjust enrichment and payment by mistake. Lastly, he asserted claims for retaliation under the FCA, 31 U.S.C. § 3730(h), and IWRPA, 740 ILCS 175/4(g), asserting that he was fired after calling defendants' attention to the improper practices he alleges.

---

[2] In 2010, the Illinois Whistleblower Reward and Protection Act was amended and renamed the Illinois False Claims Act. *See* Ill. Pub. Act 96-1304 (eff. July 27, 2010). Nonetheless, the parties continue to refer to the statute as the IWRPA. To avoid confusion, I follow the parties' usage.

3

After successive motions by various parties to dismiss previous iterations of Dolan's complaint, only Simply Rehab, Arlington, Aurora, and Broomfield remain as defendants. The only remaining causes of action are those under the FCA and IWRPA, and Dolan's common law equitable claims. *See United States Ex rel. Dolan v. Long Grove Manor, Inc.*, No. 10 C 368, 2014 WL 3583980 (N.D. Ill. July 18, 2014) (granting five separate motions to dismiss Dolan's first amended complaint); *United States v. Long Grove Manor, Inc.*, No. 10 C 368, slip op. (Apr. 21, 2015) (ECF No. 138) (granting in part and denying in part various defendants' motions to dismiss Dolan's second amended complaint).

Defendants have now moved for summary judgment. While they seek summary judgment as to all of Dolan's claims, the parties' briefing focuses exclusively on his FCA claim. Defendants maintain, and Dolan agrees, that all three claims are based on essentially the same facts and therefore stand or fall together. *See* Defs.' Reply Br. at 11; Rel.'s Resp. Br. at 11-12 & n.1[3] Hence, the discussion that follows focuses solely on

---

[3] Courts have frequently observed that the FCA and IWRPA are effectively identical – the only exception being that the former involves fraud against the federal government while the latter involves fraud against the State of Illinois. *See, e.g.*, *Bellevue v. Universal Health Servs. of Hartgrove, Inc.*, 867 F.3d 712, 716 n.2 (7th Cir. 2017) ("The IFCA closely mirrors the FCA, and to date we have not found any difference between the statutes that is material to a jurisdictional or merits analysis.") (quotation marks omitted). A grant of summary judgment as to an FCA claim does not necessarily compel summary judgment as to equitable claims of the kind Dolan asserts here but instead depends on the claims' underlying factual allegations. *Compare U.S. ex rel. Quinn v. Omnicare, Inc.*, No. CIV. 98-2031 (DRD), 2003 WL 24296532, at *12 (D.N.J. Mar. 28, 2003) ("Plaintiff's claim of unjust enrichment rests upon the same bases of liability for which he argues in connection with FCA claims, and just as he cannot establish Defendants' liability for the submission of false claims, he similarly cannot provide sufficient support for his unjust enrichment claim."), *with United States v. Adams*, 371 F. Supp. 3d 1195, 1216 (N.D. Ga. 2019) (rejecting argument that unjust enrichment and payment by mistake claims were derivative of FCA claims). In any event, by not

whether Dolan has presented sufficient evidence to withstand summary judgment on his FCA claim. I conclude that he has not.

II.

Summary judgment is appropriate when, viewing all facts and drawing all reasonable inferences in the light most favorable to the non-moving party, the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. *See, e.g.*, *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006). If a reasonable jury could, on the evidence presented, return a verdict for the non-moving party, a genuine dispute exists, and summary judgment is unwarranted. *See, e.g.*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The FCA imposes liability on "any person who...knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A) & (B). "To establish civil liability under the FCA, a relator generally must show that '(1) the defendant made a statement in order to receive money from the government; (2) the statement was false; (3) the defendant knew the statement was false; and (4) the false statement was material to the

---

disputing defendants' contention that the FCA claim is dispositive of his other claims, *see* Rel.'s Resp. Br. at 11-12 & n.1, Dolan has forfeited any argument on this point, *see, e.g.*, *Clock Spring, L.P. v. Wrapmaster, Inc.*, 560 F.3d 1317, 1329 (Fed. Cir. 2009) ("In its opposition to Wrapmaster's motion for summary judgment, Clock Spring did not assert that the dependent claims needed to be separately addressed but, instead, essentially conceded that if claim 1 was invalid the other claims were also invalid.... Clock Spring has waived its current argument that the invalidity of each of the dependent claims needs to be addressed separately.").

government's decision to pay or approve the false claim.'" *Bellevue v. Universal Health Servs. of Hartgrove, Inc.*, 867 F.3d 712, 716 (7th Cir. 2017) (quoting *United States ex rel. Marshall v. Woodward, Inc.*, 812 F.3d 556, 561 (7th Cir. 2015)).[4]

Defendants contend that they are entitled to summary judgment because Dolan has failed to present evidence that: (1) defendants provided medically unnecessary treatment to any patient; or (2) submitted any claims for reimbursement in connection with any purportedly medically unnecessary treatment. Defendants additionally argue that Dolan has failed to present sufficient evidence of scienter – i.e., that defendants knew any medically unnecessary care was provided to any of the patients at issue in the case. As discussed below, I conclude that defendants prevail on the first two of these arguments. While the issue of scienter may present a closer question, it is unnecessary to reach that question because each of defendants' first two grounds constitutes a sufficient basis for granting summary judgment.

A.

---

[4] Section 3729(a) was amended in 2009 by the Fraud Enforcement and Recovery Act (FERA), Pub. L. No. 111-21, 123 Stat 1617, 1621–25 (2009). Although these amendments are immaterial for purposes of this motion, I note that the amended version is applicable here. The FERA amendments specifically provided that they applied to "'all claims under the False Claims Act that are pending on or after [June 7, 2008].'" *United States ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632, 639 (7th Cir. 2016) (quoting 123 Stat. at 1625). The Seventh Circuit has interpreted this to mean that the amended version of the statute applies to *cases* filed on or after June 7, 2008, not to *claims for payment* pending as of that date. *Id*. at 641. While Dolan's suit alleges false claims made both before and after June 7, 2008, the suit itself was not filed until January 2010. Hence, Dolan's FCA claim arises under the post-FERA version of the statute.


As previously noted, to prevail on an FCA claim, Dolan must show that defendants made a false statement. Dolan alleges that defendants made false statements by representing that the skilled nursing and rehabilitation services they provided to the SNFs' patients were medically necessary. *See* 2d Am. Compl. ¶ 7. Accordingly, Dolan's suit fails unless he is able to present evidence from which a jury reasonably could conclude that the services provided by defendants were not medically necessary. This he has failed to do.

Dolan relies heavily on the opinion of Dr. Vivek Shah, an expert in economics and data analysis. Dr. Shah reviewed Medicare beneficiary data maintained by defendants and opined in an expert report that defendants had provided excessive amounts of therapy to patients during periods when patients' RUG levels were being determined (thereby ensuring a high Medicare reimbursement rate until the next assessment period). *United States v. Long Grove Manor, Inc.*, 315 F. Supp. 3d 1107, 1111 (N.D. Ill. 2018).[5] According to Dolan, it can be inferred on the basis of Dr. Shah's analysis that defendants provided some of its patients with medically unnecessary treatment.

Defendants contend that, under the Seventh Circuit's decision in *U.S. ex rel. Crews v. NCS Healthcare of Illinois, Inc.*, 460 F.3d 853 (7th Cir. 2006), statistical and

---

[5] Defendants previously filed a *Daubert* motion to exclude Dr. Shah's testimony (as well as the testimony of Dr. Richard Baer, another of Dolan's proposed experts). I denied the motion as to Dr. Shah's opinions concerning defendants' systematic inflation of RUG levels during assessment periods but granted the motion as to Dr. Shah's testimony with respect to the issue of damages incurred by the government as a result of the alleged scheme. *United States v. Long Grove Manor, Inc.*, 315 F. Supp. 3d 1107, 1111-14 (N.D. Ill. 2018).

probabilistic evidence of this sort is not enough to overcome a summary judgment motion. The relator in *Crews* alleged that a pharmacy was engaged in double-billing for medications that it supplied to patients of a particular nursing home. Crews noted that ten to twenty percent of the medications dispensed to the home's patients were regularly returned to the pharmacy unused (when, for example, a patient passed away). *Id*. at 855. Crews further alleged that the pharmacy reused these medications in filling prescriptions for other patients at the nursing home. *Id*. Given that sixty percent of the facility's patients were enrolled in Illinois' Medicaid program, Crews maintained that, as a matter of mathematical probability, between six and twelve percent of the recycled medications would have been redistributed to other patients. *Id*. at 856. In these instances, she asserted, the defendants ended up charging the Illinois Department of Public Aid (IDPA) and Medicaid twice for the same pills.

The Seventh Circuit affirmed the district court's grant of summary judgment in the defendants' favor. Following the decisions of other circuits, *U.S. ex rel. Quinn v. Omnicare Inc.*, 382 F.3d 432, 440 (3d Cir. 2004); *U.S. ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1313 (11th Cir. 2002), the court held that, in order to survive summary judgment, Crews needed to "provide a single false claim that was actually submitted." *Crews*, 460 F.3d at 856. Crews had produced a specific voucher seeking payment from the IDPA for certain medications. The court explained, however, that this was not enough:

> Crews needs to point to at least two vouchers to meet her burden: one voucher in which the IDPA is billed for certain pills, and then a second voucher in which the IDPA is billed again for at least one of the same pills. Without more, the Voucher standing alone proves nothing. Crews's original claim is akin to alleging the double-billing of the IDPA (and

8

> Medicaid) for drugs. Another bill submitted to the IDPA for the same pills is required; otherwise, it could be that the pills from the Voucher were later returned, distributed to a non-Medicaid patient, and billed to that patient's insurance company. In that case, Crews would have no case under the FCA. For that matter, simply by chance, all recycled drugs could have wound up in the hands of non-Medicaid patients. Statistically unlikely, to be sure, but possible. In fact, Crews introduces no evidence that that is not what happened. The burden is on Crews to show the link between two vouchers that represent two separate charges for the same pill, a burden Crews fails to carry.

*Id*. at 857.

It is true that the details of the scheme alleged in *Crews* are different from the one alleged here. Nevertheless, courts have held in a wide range of other FCA cases that, to defeat summary judgment, a relator must provide specific evidence relating to at least one false claim. *See, e.g.*, *United States ex rel. Greenfield v. Medco Health Sols., Inc.*, 880 F.3d 89, 99 (3d Cir. 2018) (affirming summary judgment for defendants where FCA claim was based on alleged kickback scheme and relator failed to point to at least one claim for which defendants sought reimbursement involving an illegally-referred patient); *United States ex rel. Booker v. Pfizer, Inc.*, 847 F.3d 52, 58 (1st Cir. 2017) (affirming summary judgment for defendants as to FCA claims based on marketing of drugs for off-label uses where relators failed to "produce competent evidence of an actual false claim made to the government" and where "relators' only proffered evidence of actual false claims was aggregate data reflecting the amount of money expended by Medicaid" for off-label use of drug). To defeat summary judgment, therefore, it is not enough for Dolan to point to the statistical probability that defendants provided unnecessary medical care to the SNFs' patients. He must present individualized evidence of at least one claim involving the provision of medically unnecessary care.

9

To be sure, courts have allowed the use of statistical sampling in some FCA cases – particularly those involving very large numbers of allegedly false claims. In these cases, however, the relator is first required to identify and demonstrate the falsity of a smaller sample of individual claims. Statistical analysis is then used to extrapolate from the sample to the total number of false claims at issue. *See, e.g.*, *United States v. Rogan*, 517 F.3d 449 (7th Cir. 2008) (observing in dictum that district judge was not required to address each of the relator's 1,812 claim forms and that "[s]tatistical analysis should suffice"); *United States v. Robinson*, No. 13-CV-27-GFVT, 2015 WL 1479396, at *3-6 (E.D. Ky. Mar. 31, 2015) (expert's testimony that 30 claims involved medically unnecessary treatment was sufficient to survive summary judgment in case involving over 25,000 claims); *United States v. Life Care Centers of Am., Inc.*, 114 F. Supp. 3d 549, 556 (E.D. Tenn. 2014) (statistical methods could be used to prove claims brought under the FCA involving Medicare overpayment based on random sample of 400 admissions from more than 80 facilities). At most, these decisions hold only that a relator need not demonstrate the falsity of *every* particular claim, not that it is unnecessary to demonstrate the falsity of *any* particular claim.

For his part, Dolan does not dispute that he must produce evidence of at least one specific fraudulent claim to survive summary judgment. *See* Rel.s' Resp. Br. at 5. He maintains, however, that he has satisfied this requirement by pointing to a set of false claims. In support of this contention, Dolan cites to the final paragraph of his Local Rule 56.1(b)(3)(C) Statement, which states: "Mr. Dolan disclosed the following specific patient claims that did not qualify for Medicare Part A skilled nursing coverage, because they came into the Defendant skilled nursing facility from Alexian Brothers Behavioral

10

Health without a qualifying spell of illness or hospitalization, but received skilled nursing care from Defendants who in turn billed claims and collected from Medicare." Rel.'s L.R. 56.1 (b)(3)(C) Stmt. ¶ 37. The paragraph goes on to name six individual patients[6] and includes a citation to a single exhibit. *Id*. (citing Exhibit 34). The exhibit in turn consists of Dolan's prior response to an interrogatory in which defendants asked Dolan to specify, with respect to his previous interrogatory answers, his "complete factual basis for believing that the claim, record, statement, representation, act or omission violated the False Claims Act." Ex. 34 at 2. Dolan's response lists approximately sixty individuals (including the six singled out in his Local Rule 56.1 Statement). For each of these patients, Dolan provides a statement setting forth his "Specific Additional Basis" for asserting that claims relating to these patients are false. *Id*.

    Dolan's response fails in a number of respects. To begin with, I note that Dolan has violated Local Rule 56.1 by failing to specify any particular page of the exhibit he cites. *See, e.g.*, *Finkl v. Nielsen*, No. 17 CV 4386, 2019 WL 109377, at *1 (N.D. Ill. Jan. 4, 2019) ("Local Rule 56.1(b) requires the party opposing summary judgment to file responses and additional facts that include 'specific references to the affidavits, parts of the record, and other supporting materials relied upon.'") (quoting L.R. 56.1(b)(3)(B) & (C)). Moreover, having examined the exhibit in its entirety, it makes no references to claims, false or otherwise. It mentions only patients.

---

[6] The parties' exhibits in connection with this motion were filed under seal in order to protect individuals' privacy. Accordingly, I refer to these patients only by their initials.

11

Far more problematic, however, is the fact that Dolan makes no attempt to show that the therapy these patients received was medically unnecessary. Instead, as indicated above, he argues that the patients did not qualify for skilled nursing coverage because they were transferred to the SNFs from a psychiatric facility. *See* Rel.'s L.R. 56.1 (b)(3)(C) Stmt. ¶ 6 ("Qualification for Medicare Part A skilled nursing services is not only based on 'medical necessity'; for example, a psychiatric hospitalization immediately prior to transfer into a skilled nursing facility is insufficient for Medicare Part A skilled nursing coverage (regardless of 'medical necessity')."

As defendants note, this appears to upend Dolan's entire theory of the case. The complaint's allegations make clear that Dolan's FCA claim is based on the assertion that defendants provided patients with medically unnecessary treatment solely to obtain a greater reimbursement rate. *See* 2d Am. Compl. ¶ 7 ("Because the SNF's (sic) knowingly submitted false claims to the Medicare programs for medically unreasonable, unnecessary and unskilled therapy services, and used false records and statements to support those false claims, the United States brings this action to recover treble damages and civil penalties under the Federal False Claims Act."). The same is true for his unjust enrichment claim. *See id*. ¶ 190("By virtue of submitting claims to Medicare for medically unreasonable, unnecessary, and unskilled services, the defendant obtained inflated payments from the United States. Thus, the defendant was unjustly enriched at the expense of the United States."). Indeed, in my most recent opinion in the case, I observed that "the entire premise of relator's theory is that legitimate RUG classifications must be based on individualized medical necessity determinations." *United States v. Long Grove Manor, Inc.*, 315 F. Supp. 3d 1107, 1114 (N.D. Ill. 2018).

To be sure, the complaint mentions false statements other than those based on medical necessity. For example, Dolan alleges that defendants falsely certified that they were "in compliance with pertinent laws and regulations when in fact, defendants knew that they had violated various laws and regulation [sic], including those pertaining to kickbacks, providing medically necessary services, and the waiver of co-payments and deductibles." 2d Am. Compl. ¶ 123. Given that Dolan's claims for violation of kickback regulations and statutes have been dismissed, *Long Grove Manor*, No. 10 C 368, slip op. at 10-11, Dolan does not rely on them in opposing summary judgment. At any rate, nothing in Dolan's second amended complaint so much as hints that defendants might have violated the FCA simply by providing skilled nursing care to patients who had previously undergone psychiatric hospitalization.

This leaves unclear precisely what false statements Dolan wishes to allege as the basis for his FCA claim. Indeed, Dolan's response does not specifically assert that the claims for these individuals were false. He says only that the skilled nursing services provided to the patients were not covered. Presumably, Dolan means to claim that defendants made false statements by seeking reimbursement for services that were not covered by Medicare. Whatever the merits of such a theory, however, Dolan has forfeited it by failing sufficiently to develop it, *see, e.g.*, *Campania Mgmt. Co. v. Rooks, Pitts & Poust*, 290 F.3d 843, 852 (7th Cir. 2002) ("Perfunctory and undeveloped arguments are waived."), and by waiting too long to advance it, *see, e.g.*, *Delaware Motel Assocs., Inc. v. Capital Crossing Servicing Co. LLC*, No. 17 C 1715, 2017 WL 4512709, at *3 (N.D. Ill. Oct. 10, 2017) ("Though a plaintiff need not plead a legal theory and may therefore change legal theories throughout the course of litigation, a court may

13

treat a theory raised for the first time at the summary judgment stage as forfeited if 'the new argument change[s] the complaint's factual theory in an important way.'") (quoting *Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 860 (7th Cir. 2017)).

Yet even as it stands, Dolan's argument fails on the merits. To support his premise that skilled nursing services are not covered by Medicare following psychiatric hospitalization, Dolan relies entirely on the testimony of Whitney Arado, Arlington's marketing director between 2000 and 2012. *See* Rel.'s L.R. 56.1 Stmt. ¶ 29. Dolan does not explain why Arado should be deemed competent to testify on this point – and in fact, her testimony evinces diffidence. *See* Arado Dep., Ex. 7 at 137:23-138:1 ("Q: So anything out of, like, the DSM, something mental wouldn't count toward Medicare Part A coverage? A: To my understanding, yes.").

Moreover, even when taken on its own terms, Arado's testimony does not support the proposition for which Dolan cites it. He relies on the following exchange during Dolan's deposition:

> Q: And when patients stayed at Alexian Brothers Behavioral Health, as far as you knew, would that be a qualifying hospital stay for Medicare Part A skilled nursing coverage?
>
> A: It would depend on what they're in the hospital for.
>
> Q: And what are some of the things that they could be in the hospital for that would not mean that they would have Medicare part A coverage for --
>
> A: It could have to be something medical related to their stay.
>
> Q: So what's something not medical?
>
> A: Maybe a psyche diagnosis that's not a true medical diagnosis like CHF. They would have to be treated for a medical diagnosis at the behavioral health hospital to qualify.

*Id*. at 137:7-22.

Arado does not state that Medicare coverage is categorically unavailable for skilled nursing services whenever a patient is transferred to an SNF following a psychiatric hospitalization. She plainly says that coverage *is* possible so long as the patient was treated for a medical diagnosis at the psychiatric facility from which he or she was transferred.

Further, Dolan offers no evidence to show that the six patients he has identified were transferred to any of the SNFs following a psychiatric hospitalization. Although his interrogatory answers state that each of the six patients transferred to the Arlington facility from Alexian Brothers Behavior Health ("ABBH"), the supporting documentation cited in his answers has not been included in the record. Nor does Dolan offer any evidence to show that ABBH is indeed a "psychiatric facility" in the relevant sense. Nor in any case does the exhibit indicate the nature of the treatment the patients received at ABBH. Several of the explanations consist of a single conclusory statement of the form: "Transferred from Alexian Behavioral. No qualifying spell of illness or hospitalization." *See* Ex. 34 at 3 (patient R.A.); *id*. at 20 (patient D.N.); *id*. at 21 (patient R.R.). Other explanations refer to multiple diagnoses and hospitalizations. Dolan makes no effort to explain the significance of the document's truncated comments. In short, even assuming the truth of Dolan's assertion that "a psychiatric hospitalization immediately prior to transfer into a skilled nursing facility is insufficient for Medicare Part A skilled nursing coverage," he has failed to show that this applies to the patients he has singled out.

The upshot of this is that Dolan has failed to come forward with evidence of any particular claim with respect to which defendants made a false statement. Dolan is unable to show that defendants falsely represented their skilled nursing care to be medically necessary because he has presented no evidence that defendants in fact provided medically unnecessary care to any particular patient. Indeed, it is unclear whether Dolan still wishes to advance this theory or whether he has abandoned it. Dolan is also unable to show that defendants made false statements by seeking reimbursement for skilled nursing care provided to patients who previously were hospitalized for psychiatric reasons. Dolan offers no legal authority for the proposition that prior psychiatric hospitalization categorically bars Medicare coverage for skilled nursing services; and he presents no evidence that any of the patients he has identified in fact underwent a psychiatric hospitalization prior to his or her transfer to the Arlington SNF. It follows that defendants are entitled to summary judgment on Dolan's FCA claim.

B.

Defendants' second ground for seeking summary judgment is closely related to the first: they maintain that, even assuming defendants had provided the patients in question with medically unnecessary treatment, Dolan has failed to present evidence of any specific false claim that defendants actually presented to Medicare for that treatment. Courts have repeatedly emphasized that "[t]he submission of a claim is ... [not] a 'ministerial act,' but the *sine qua non* of a False Claims Act violation.") *U.S. ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1311 (11th Cir. 2002); *United States v. UnitedHealthcare Ins. Co.*, No. 15-CV-7137, 2018 WL 2933674, at *7 (N.D. Ill. June 12, 2018) ("But without a false submission, this practice is not a violation of the False

16

Claims Act. After all, a false claim is the '*sine qua non* of a False Claims Act violation.'") (quoting *United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1002 (9th Cir. 2002)); *Mason v. Medline Indus., Inc.*, 731 F. Supp. 2d 730, 736 (N.D. Ill. 2010) (citing *Clausen*). To defeat summary judgment, therefore, it is not enough merely to demonstrate the possibility that a false claim was submitted to the government. Rather, a relator must present evidence that a specific claim has actually been submitted. *See, e.g.*, *U.S. ex rel. Quinn v. Omnicare Inc.*, 382 F.3d 432, 440 (3d Cir. 2004) ("Without proof of an actual claim, there is no issue of material fact to be decided by a jury. Quinn's theory that the claims 'must have been' submitted cannot survive a motion for summary judgment."); *United States ex rel. Lisitza v. Par Pharm. Companies, Inc.*, 276 F. Supp. 3d 779, 805 (N.D. Ill. 2017) ("[T]he Court of Appeals [in *Crews*] rejected the notion, expressly advanced by the plaintiffs in this case, that the statistical likelihood that false claims were submitted would suffice to satisfy the plaintiff's burden to prove that at least one specific false claim was submitted. It is not enough to say 'given this scheme, surely there were false claims submitted'; the plaintiff is required to prove that to be the case.") (citations omitted); *U.S. ex rel. Turner v. Michaelis Jackson & Assocs., L.L.C.*, No. 03-CV-4219-JPG, 2011 WL 13510, at *7 (S.D. Ill. Jan. 4, 2011) ("If a claim or statement is false as prescribed by the FCA, a relator has the burden of proving, in at least one instance, the submission of an actually false claim or statement if her *qui tam* suit is to survive summary judgment.... The likelihood or probability of a false submission is simply not enough.").

In response, Dolan appears to argue that, once he has presented evidence identifying a specific false claim, he is permitted to use statistical evidence to show that

17

other false claims were submitted. See Rel.'s Resp. Br. at 6 ("Here to [sic], once Mr. Dolan satisfies the requirement of at least one specific false claim," he is not "preclude[d]... from providing additional evidence and analysis of Defendants' electronic therapy records in order to support his theory that Defendant knowingly presented, or caused to be presented, other false or fraudulent claims for payment or approval."). Dolan cites no case authority to support his position. But even assuming that Dolan's assertion is correct, this argument is a non-starter because, as already discussed, he has not presented evidence of any specific false claim made by defendants.

The only other part of Dolan's opposition that bears any relevance to the issue of claim-submission is his passing assertion that "Defendants submitted bills to Medicare (CMS) for Medicare Part A skilled nursing care and received payment from same." Rel.'s L.R. 56.1(b)(3)(C) Stmt. ¶ 34. But the two exhibits to which he cites in support – Exhibits 31 and 32 – provide no basis for inferring that defendants submitted bills to Medicare for medically unnecessary treatment.

Exhibit 31 is a miscellany of spreadsheets, billing invoices, and similar documents. Once again, Dolan has violated Local Rule 56.1 by citing to the entire exhibit without directing the court to any particular page. As with Dolan's citation to Exhibit 34, this constitutes a violation of Local Rule 56.1. *See, e.g.*, *Finkl*, 2019 WL 109377, at *1. In this instance, the violation is particularly egregious because Exhibit 31 runs to roughly 180 pages. On this basis alone, Dolan's citation to Exhibit 31 can be disregarded. As the Seventh Circuit has explained:

> the factual statements required by Rule 56.1 … are not merely superfluous abstracts of the evidence. Rather, they are intended to alert the court to precisely what factual questions are in dispute and point the

18

> court to the specific evidence in the record that supports a party's position on each of these questions. They are, in short, roadmaps, and without them the court should not have to proceed further, regardless of how readily it might be able to distill the relevant information from the record on its own.

*Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir. 1994).

Nevertheless, even after examining the exhibit, I am unable to see any respect in which it supports Dolan's position. Only sixteen of the exhibit's pages pertain to any of the individuals whom Dolan has identified, *see* Ex. 31, LGM0015226 - LGM0015242 (and some of these are duplicates, *compare* LGM0015226 *with* LGM0015227; and LGM0015232 *with* LGM0015233). Of the six patients, only R.A. and C.B. are mentioned. The material is filled with codes and columns of data whose significance Dolan does not explain. The only semi-legible page is page LGM0015242, a document entitled "Face Sheet" from Arlington. It contains general information about patient C.B. and includes several diagnosis codes; but it does not clearly indicate what therapy, if any, she received at Arlington, nor what bills, if any, were submitted for payment.

The same is true of Exhibit 32 (which, once again, Dolan cites in its entirety without a specific page reference). This is a different collection of spreadsheets that appear to show billing from the Arlington and Aurora SNFs. Once again, the import of this information is not readily apparent. Nothing in the document mentions any of the six patients, nor indicates the type of therapy for which Medicare is being billed. At most, the exhibit shows only that the SNFs billed Medicare, a proposition not in dispute. It provides no basis for concluding that defendants submitted bills to Medicare for medically unnecessary treatment.

In short, Dolan has failed to present evidence of any false claim actually submitted by defendants for reimbursement to Medicare. Thus, even if he had succeeded in presenting evidence of a specific individual to whom defendants provided medically unnecessary skilled services – which he has not – defendants still would be entitled to summary judgment.

<div style="text-align:center">III.</div>

For the reasons discussed above, defendants' motion for summary judgment is granted as to all of Dolan's remaining claims.

```
                              Elaine E. Bucklo
                         United States District Judge
```

Dated: July 2, 2019